Ollie **LATTIMORE**, Plaintiff–Appellee,

v.

**POLAROID CORPORATION,**
Defendant–Appellant.

No. 96–1104.

United States Court of Appeals,
First Circuit.

Heard July 30, 1996.

Decided Nov. 5, 1996.

Stephen B. Deutsch, with whom Michael L. Rosen and Foley, Hoag & Eliot, were on brief, for appellant.

Stephen Wald, with whom William F. Macauley, Anthony D. Rizzotti and Craig and Macauley, were on brief, for appellee.

Before SELYA, Circuit Judge, TORRES * and SARIS,** District Judges.

TORRES, District Judge.

Polaroid Corporation ("Polaroid") appeals from a judgment entered in favor of Ollie Lattimore with respect to several claims of racial harassment and employment discrimination brought pursuant to 42 U.S.C. § 2000e *et seq.* ("Title VII") and Mass. Gen. L. ch. 151B, § 4 ("Chapter 151B"). Polaroid contends that the District Court erred in denying Polaroid's motions for summary judgment, for judgment as a matter of law and for a new trial. Because we conclude that the motion for judgment as a matter of law should have been granted with respect to some of Lattimore's claims and because it appears that the jury's verdict may have rested on those claims, we vacate the judgment and remand for a new trial.

### *Factual Background*

Ollie Lattimore, a black man, was hired by Polaroid in 1977 as a machine operator. During part of Lattimore's tenure at Polaroid, his supervisor was Bill Mitchell, a white man. In 1978, Lattimore sustained a job-related back injury that resulted in his being placed on a "medical restriction" that limited his duties to tasks that did not require repetitive bending, twisting or lifting objects weighing more than fifteen pounds. The restriction was renewed each year until 1989 and, because of it, Lattimore was assigned to light-duty work.

At trial, Lattimore testified that, in March of 1989, Mitchell assigned him to certain janitorial tasks that required heavier lifting. When Lattimore protested that his medical restriction prevented him from performing those tasks, Mitchell allegedly replied, "I'm sick of you people all the time lazy, trying to skip work. There is the door. Don't let it hit you in the ass." Lattimore interpreted the statement as a racial slur and stated that he began doing the janitorial work because he feared for his job. Mitchell denied asking Lattimore to perform tasks prohibited by his medical restriction and also denied making the statement attributed to him.

According to Lattimore, on March 16, 1989, he re-injured his back while emptying a barrel into a dumpster. Later that day, he was seen by Dr. Hillier, a physician who had been treating him for his pre-existing back problems. Dr. Hillier provided Lattimore with the first in a series of reports stating that Lattimore was disabled from returning to work. The following day, Lattimore presented the report to Mitchell who allegedly said, "I'm getting sick and tired of you people. You're all lazy all the time." Mitchell denied making that statement, too.

In any event, Polaroid immediately placed Lattimore on short-term disability ("STD") status pursuant to the company's short-term disability policy. Under that policy, an employee is eligible for STD benefits if medical reports submitted by the employee's treating physician support the conclusion that the employee is totally disabled. The policy further provides that in the event that Polaroid's Medical Review Board ("the Board") disagrees with the assessment by the employee's physician, Polaroid may require an independent medical examination ("IME"), the results of which will be deemed conclusive with respect to the employee's ability to work.

Approximately twelve weeks after Lattimore was accorded STD status, Dr. Kantrowitz, Polaroid's medical director and the chairman of the Medical Review Board, spoke to Dr. Hillier about Lattimore's condition. Dr. Hillier indicated that Lattimore was improving and should be able to return to work on July 24 if an examination scheduled for July 21 showed the progress that Dr. Hillier anticipated.

* Of the District of Rhode Island, sitting by designation.

** Of the District of Massachusetts, sitting by designation.

After subsequently receiving a report from Dr. Hillier listing Lattimore's condition as "undetermined" and learning that the examination scheduled for July 21 had been postponed until August 8, the Board decided to require an IME without waiting for the results of Dr. Hillier's examination. Polaroid claims that the Board's decision was based on ambiguities in Dr. Hillier's reports and on the results of a July 13 workers' compensation examination performed by Dr. James Dolphin which indicated that Lattimore was able to perform light work. Apparently, Dr. Dolphin's findings had caused Lattimore to be denied workers' compensation benefits.

The Board gave Lattimore the opportunity to select one of three "independent" physicians to conduct the IME and he chose Dr. Marcos Ramos. The IME was performed on August 23. According to Lattimore, the examination was very brief and did not include any diagnostic tests. Dr. Ramos, on the other hand, indicated that the examination was thorough and lasted approximately one and one-half hours.

The following day, Richard Williams, Polaroid's corporate benefits administrator, informed Lattimore that Dr. Ramos had determined that Lattimore was not totally disabled; that he could return to light-duty work immediately and that he could resume full duties in two weeks. Accordingly, Williams instructed Lattimore to return to work the next day. Although Williams' statements regarding Dr. Ramos' conclusions were consistent with the findings contained in Dr. Ramos' written report, the report was not issued until one week later. Williams sought to explain this by testifying that the findings were related to him during a telephone conversation with Dr. Ramos on August 23. However, Dr. Ramos had no recollection of any such conversation.

Matters came to a head when Lattimore refused to return to work asserting that he still was totally disabled. On September 9, Lattimore's employment was terminated. Polaroid presented evidence that the decision was made by Eddy Montes, Lattimore's new supervisor, based upon the company's policy of terminating employees who refused to work after being removed from STD status.

### Procedural History

On October 27, 1989, Lattimore filed a written administrative charge with the Massachusetts Commission Against Discrimination ("MCAD") and with the Equal Employment Opportunity Commission ("EEOC"). The charge recited that Lattimore had sustained a back injury on March 16, 1989, and had filed for worker's compensation benefits on June 26, 1989. It went on to state that he was later fired for refusing to return to work even though his back injury rendered him totally disabled. Based on that account of the pertinent events, Lattimore alleged that:

> Respondent does not treat white workers *who are handicapped and have filed for workers compensation* the way they have treated me. Ray (Lnu), a machine operator in my department, has been out on workers comp numerous times and has not been harassed and fired as I have been. I believe I was fired and treated differently due to my race, black, and my handicap, back injury, ... (emphasis added).

After investigating and finding no probable cause to believe that Polaroid had discriminated against Lattimore, the MCAD dismissed the charge. The EEOC did not conduct any independent investigation but accepted MCAD's finding and issued Lattimore a right-to-sue letter on March 24, 1992.

On June 22, 1992, Lattimore, acting *pro se*, commenced this action in the District Court. His complaint was more detailed than the administrative charge but covered essentially the same ground. It alluded to the March 16 back injury which Lattimore attributed to being assigned to duties inconsistent with his medical restriction. It also stated that, after being placed on STD status, Lattimore was wrongfully removed from that status when he applied for workers' compensation benefits that would have supplemented his disability payments. Finally, the complaint referred to Lattimore's termination for refusing to return to work despite his claim that he was unable to do so. Like the administrative charge, the complaint asserted that, because of his race, Lattimore

was denied benefits to which he was entitled. More specifically, it stated:

> I believe that the Polaroid Corp. used the fact that I was an uneducated black to hinder my every effort to receive the compensation which was due me both through the Workmen's Compensation laws and the Company's Short Term and Long Term Disability programs.

Nine months later, after retaining counsel, Lattimore amended his complaint. The amended complaint, for the first time, alleged that, on unspecified occasions after Lattimore's 1979 back injury, "supervisors and other employees at Polaroid harassed ... [him] ... about his handicap" and that such harassment was "coupled with verbal reference to Lattimore's race."

The amended complaint contained five counts asserting a variety of claims for both handicap and race discrimination. The District Court granted Polaroid's motion for summary judgment with respect to three of the counts but denied the motion with respect to the other two counts. The case proceeded to trial on those two counts which encompassed four claims: (1) racial harassment by co-employees in violation of Title VII; (2) racial harassment by co-employees in violation of Chapter 151B; (3) race discrimination regarding terms and conditions of employment in violation of Title VII; and (4) race discrimination regarding terms and conditions of employment in violation of Chapter 151B.

During trial, evidence was presented relating to all four claims. That evidence included testimony about the comments allegedly made by Mitchell on or before March 16 and how Mitchell allegedly coerced Lattimore into performing work inconsistent with his medical restriction thereby causing the March 16 injury. At the conclusion of Lattimore's case and, again, at the close of the evidence, Polaroid moved for judgment as a matter of law with respect to all four claims. The grounds for those motions were essentially the same as the grounds relied upon in Polaroid's previous motion for summary judgment. Like the motion for summary judgment, the motions for judgment as a matter of law were denied.

The District Judge charged the jury on all four claims but a questionnaire submitted to the jury asked only for determinations of whether Lattimore was "racially harassed," whether any such harassment proximately caused injury and, if so, the amount of damages to be awarded.[1] See Appendix A.[2] The jury answered the first two questions in the affirmative and fixed damages at $400,000.

After denying Polaroid's motion for a new trial, the District Court entered judgment for Lattimore in the amount of $562,000 representing the damages fixed by the jury plus interest. It is from that judgment that Polaroid appeals.

In its appeal, Polaroid asserts that the District Court erred in denying Polaroid's motion for summary judgment and/or judgment as a matter of law and in denying Polaroid's motion for a new trial. Our analysis is limited to reviewing the denial of the motion for judgment as a matter of law because the conclusions we reach render the remaining claims of error moot.

### Discussion

Polaroid argues that it was entitled to judgment as a matter of law on the harassment claims asserted under both Title VII and Chapter 151B because those claims were beyond the scope of Lattimore's administrative charge. Polaroid also contends that judgment in its favor should have been entered regarding the Title VII harassment claim because Lattimore provided no evidence that Polaroid knew or should have known of the alleged harassment. Finally, Polaroid asserts that the Chapter 151B harassment claim is barred because the administrative charge was not filed within the period of time prescribed by Massachusetts law.

---

1. Polaroid's counsel did raise an objection to the questionnaire, but that objection appeared to be directed only to the time frame during which the alleged harassment may have occurred.

2. In his brief, Lattimore's counsel erroneously describes the questionnaire as asking whether Polaroid "unlawfully discriminated." Appellee's Br. at 3.

With respect to the discrimination claims Polaroid argues that Lattimore failed to establish a *prima facie* case because he presented no evidence that he was totally disabled, a *sine qua non* of eligibility for continued STD status. In addition, Polaroid maintains that it is entitled to judgment on the discrimination claims because there was insufficient evidence that its proffered reason for denying Lattimore continued STD status and later terminating his employment was pretextual. Finally, Polaroid asserts that the Title VII discrimination claim fails due to the absence of any evidence of discriminatory intent on the part of Polaroid.

### I. *Standard of Review*

■ We review, *de novo*, a District Court's denial of a motion for judgment as a matter of law. *Sandy River Nursing Care v. Aetna Casualty*, 985 F.2d 1138, 1141 (1st Cir.), *cert. denied*, 510 U.S. 818, 114 S.Ct. 70, 126 L.Ed.2d 39 (1993). Like the District Court, we are required to consider the evidence in the light most favorable to the party against whom the motion is directed and to draw all reasonable inferences favorable to that party. *Aetna Casualty Surety Co. v. P & B Autobody*, 43 F.3d 1546, 1556 (1st Cir. 1994).

### II. *The Harassment Claims*

■ Harassment based on membership in a protected class is one form of employment discrimination. In sex discrimination cases, we have recognized that workplace harassment may take either of two forms. It may consist of promises of favorable treatment or threats of unfavorable treatment calculated to coerce an employee into submitting to unwelcome sexual advances (i.e., *quid pro quo* harassment). *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 897 (1st Cir.1988). Alternatively, it may consist of offensive, gender-based conduct that is "severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive" and is subjectively perceived by the victim to be abusive. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114

S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). While the concept of *quid pro quo* harassment has no application to race discrimination cases, the concept of hostile environment harassment does. *Daniels v. Essex Group, Inc.*, 937 F.2d 1264 (7th Cir.1991); *Johnson v. Teamsters Local Union No. 559*, 1995 WL 355304 (D.Mass.1995), *appeal docketed*, No. 87–215 (1st Cir. Oct. 25, 1995).

■ Hostile environment harassment is readily distinguishable from "job status" discrimination, another type of employment discrimination that occurs when action is taken that adversely affects an employee's job status, remuneration or benefits and it is based upon the employee's membership in a protected class. *See, e.g., Tart v. Hill Behan Lumber Co.*, 31 F.3d 668, 672 (8th Cir.1994). Thus, when both harassment and "job status" discrimination claims are made, they are analyzed separately. *See, e.g., Lipsett*, 864 F.2d 881 (sex discrimination); *Edwards v. Wallace Community College*, 49 F.3d 1517 (11th Cir. 1995) (race discrimination). A job status discrimination claim is not converted into a harassment claim simply because it is labeled as such.

■ In this case, Lattimore's harassment claims are hostile work environment claims. Moreover, although the administrative charge relating to the denial of workers' compensation benefits and continued STD status uses the word "harassment," that label does not alter the fact that the harassment claims are based entirely upon the comments allegedly made by Mitchell and upon the allegation that Mitchell coerced Lattimore to perform tasks inconsistent with his medical restriction. Clearly the alleged harassment must have occurred on or before March 16, 1989, because that is when Lattimore ceased work and, therefore, was no longer subject to any hostile work environment. That is confirmed by Lattimore's brief which describes the harassment claims as being "for the March 1989 events which led to Lattimore's total disability." Appellee's Br. at 2.

Polaroid does not seriously question whether the March 1989 conduct alleged by Lattimore was so severe and pervasive that it created a hostile work environment. Polaroid's principal argument is that the

harassment claims are barred because they are beyond the scope of the administrative charge filed by Lattimore.

■ Both Title VII and Chapter 151B require an employee to file an administrative charge as a prerequisite to commencing a civil action for employment discrimination. *See* 42 U.S.C. § 2000e–5(f); Mass. Gen. L. ch. 151B, §§ 5–9. The purpose of that requirement is to provide the employer with prompt notice of the claim and to create an opportunity for early conciliation. *See Powers v. Grinnell Corp.,* 915 F.2d 34, 37 (1st Cir.1990) (addressing charge requirements under the ADEA); *Ruffino v. State Street Bank and Trust Co.,* 908 F.Supp. 1019, 1037 (D.Mass.1995).

■ That purpose would be frustrated if the employee were permitted to allege one thing in the administrative charge and later allege something entirely different in a subsequent civil action. Consequently, we have stated that, in employment discrimination cases, "[t]he scope of the civil complaint is . . . limited by the charge filed with the EEOC and the investigation which can reasonably be expected to grow out of that charge." *Powers,* 915 F.2d at 38 (quoting *Less v. Nestle Co.,* 705 F.Supp. 110, 112 (W.D.N.Y.1988)); *see also Johnson v. General Electric,* 840 F.2d 132, 139 (1st Cir.1988).

■ In cases where, as here, the employee acts *pro se*, the administrative charge is liberally construed in order to afford the complainant the benefit of any reasonable doubt. *Westphal v. Waukesha Dresser/Waukesha Engine Div.,* 855 F.Supp. 1009, 1015 (E.D.Wis.1994); *Pickney v. Am. Dist. Tel. Co.,* 568 F.Supp. 687, 690 (E.D.Ark. 1983). As we have said, an employee is not required to comprehensively set forth with "literary exactitude" all of the facts and theories upon which his or her claim is based. *See Powers,* 915 F.2d at 38 (citations omitted).

■ However, *pro se* status does not relieve an employee of the obligation to meet procedural requirements established by law. *See United States v. Michaud,* 925 F.2d 37, 41 (1st Cir.1991). Even a *pro se* complainant is required to describe the essential nature of

the claim and to identify the core facts on which it rests. *Id.* Moreover, the latitude extended in *pro se* employment discrimination cases does not allow the complainant "to file general charges with the [administrative agency] . . . and then expect that this allegation will permit all claims of race-based discrimination in a subsequent law suit." *Tart,* 31 F.3d at 673 (quoting *Rush v. McDonald's Corp.,* 966 F.2d 1104, 1112 (7th Cir.1992)). Nor does it entitle the complainant to make a specific claim based on one set of facts and, later, assert an entirely different claim based on a different and unrelated set of facts. *Pickney,* 568 F.Supp. at 690.

In this case, Lattimore's administrative charge plainly and specifically describes his claim to be that he was discriminated against because, unlike white workers who had been injured and applied for workers' compensation benefits, he was directed to return to work and was fired when he refused. Those allegations relate solely to *employment decisions* made by Polaroid *after* Lattimore's March 16 injury and cannot reasonably be construed to include any *harassment* by Mitchell *before* Lattimore's injury.

Indeed, there are indications that Lattimore himself did not consider the events occurring before March 16 to be part of his administrative charge. The *pro se* complaint that Lattimore filed in the District Court nearly three years later, although more detailed than the administrative charge, also focused entirely on Lattimore's removal from STD status and his subsequent termination which he attributed to his application for workers' compensation benefits and the fact that he was black. Like the administrative charge, it failed to mention any pre-injury harassment by Mitchell or anyone else. That claim was not raised until ten months later when an amended complaint was filed by Lattimore's counsel.

■ For many of the reasons already mentioned, we further find that the harassment claims were not reasonably within the scope of an agency investigation of Lattimore's administrative charge. An investigation is a systematic inquiry into a particular matter. When it is launched in response to a

charge of employment discrimination, the direction and scope of the investigation are guided by the allegations contained in the charge. Although an investigation is not strictly confined to allegations in the charge, it is not a "fishing expedition" that should be expected to extend to matters unrelated to the charge.

Here, Lattimore's charge focused exclusively on his termination and the events leading up to it, all of which occurred after his injury. It contains no hint of any claim that, before his injury, Lattimore was harassed by Mitchell or anyone else. It makes no mention of Mitchell or any incidents of harassment.

The two claims are based upon different facts that are separate and distinct both qualitatively and temporally. In addition, they relate to the conduct of different individuals. The record indicates that the decision to discontinue Lattimore's STD status was made by the Board and that the termination decision was made by Montes after consulting with Polaroid's human resources department. On the other hand, it was Mitchell who engaged in the alleged harassment. Therefore, it is difficult to see how Mitchell's conduct before March 16 reasonably could be expected to be within the scope of an agency's investigation of the charge. *See Tart,* 31 F.3d at 672–73.

Our finding in this regard is buttressed by MCAD's Notice of Final Disposition which indicates that, in fact, its investigation did not extend to any alleged harassment by Mitchell. MCAD's findings focus exclusively on Lattimore's termination and do not include any reference to claims of pre-injury harassment.

Having decided that the harassment claims are beyond the scope of Lattimore's administrative charge, we conclude that judgment as a matter of law should be entered in favor of Polaroid with respect to the harassment claims made pursuant to both Title VII and Chapter 151B. Accordingly, there is no need for us to consider Polaroid's arguments that the Title VII harassment claim fails due to the absence of any evidence that Polaroid knew or should have known of the alleged harassment and/or that the Chapter 151B harassment claim is time barred.

## III. *The Job Status Discrimination Claims*

The analytical framework applicable to employment discrimination claims where there is no "direct" evidence of discrimination is well established. First, the employee must prove a *prima facie* case by demonstrating that he or she belongs to a protected class and was denied a position or benefits for which the employee was qualified. The burden then shifts to the employer to present a legitimate non-discriminatory reason for its action. If that is done, the employee is afforded an opportunity to prove that the proffered reason is pretextual. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973); *Smith v. Stratus Computer, Inc.,* 40 F.3d 11, 15–16 (1st Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1958, 131 L.Ed.2d 850 (1995); *Blare v. Husky Injection Molding Systems Boston, Inc.,* 419 Mass. 437, 646 N.E.2d 111, 114–17 (1995).

It is at this point that Massachusetts law and federal law diverge. Since Massachusetts is a "pretext only" jurisdiction, proof of pretext is sufficient to warrant a finding of discrimination under Chapter 151B. *Blare,* 646 N.E.2d at 117. In contrast, Title VII requires that, in addition to proving pretext, the employee also must prove that the employer was motivated by a discriminatory purpose. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993); *Smith,* 40 F.3d at 16 (employee has ultimate burden of proving "(1) that the employer's articulated reason for the job action is a pretext, *and* (2) that the true reason is discriminatory"); *Woods v. Friction Materials, Inc.,* 30 F.3d 255, 260 (1st Cir.1994) (employee must prove "*both* that the employer's articulated reason is false, and that discrimination was the actual reason for its employment action."). When the *prima facie* case is very strong and disbelief of the proffered reason provides cause to believe that the employer was motivated by a discriminatory purpose, proof of pretext "may" be sufficient. *Hicks,* 509 U.S.

at 511, 113 S.Ct. at 2749; *Smith,* 40 F.3d at 16; *Woods,* 30 F.3d at 261 n. 3; *see also Connell v. Bank of Boston,* 924 F.2d 1169 (1st Cir.), *cert. denied,* 501 U.S. 1218, 111 S.Ct. 2828, 115 L.Ed.2d 997 (1991).

Polaroid argues that it is entitled to judgment with respect to both the Chapter 151B and Title VII discrimination claims because Lattimore's evidence was insufficient to establish either a *prima facie* case or that Polaroid's proffered reason was pretextual. Polaroid also argues that the Title VII claim fails for the additional reason that there was no evidence of any discriminatory intent on the part of Polaroid.

### A. *The Prima Facie Case*

■ Ordinarily, when a claim of discriminatory firing is made, the "qualified" prong of the employee's *prima facie* case consists of proof that the employee was adequately performing the job in question. However, this case is somewhat atypical because Lattimore does not claim that he was fired despite being able to work. Instead, Lattimore claims that he was denied STD status even though he was physically *un*able to work and that the loss of STD status resulted in his termination. Consequently, the issue is whether Lattimore's evidence was sufficient to make a *prima facie* showing that he was qualified for STD status.

Under Polaroid's STD policy, an employee must be *totally* disabled from performing his or her job or any other work offered by the company in order to qualify for STD status. As already noted, an employee may establish eligibility by submitting periodic reports from a physician stating that the employee is disabled. If the Medical Review Board disagrees with the physician's opinion, it may require an IME to resolve the dispute.

Polaroid argues that the record is devoid of any evidence that Lattimore was "totally" disabled. That argument is based principally on testimony by Dr. Hillier conceding that, notwithstanding his previous reports to Polaroid stating that Lattimore was totally disabled, Lattimore was able to perform limited forms of light duty work at the time his STD status was discontinued.

However, contrary to Polaroid's contention, that testimony does not negate Dr. Hillier's previously expressed opinion that, in August of 1989, Lattimore was "disabled." Nor does it preclude a finding that Lattimore was "totally disabled" within the meaning of Polaroid's STD policy.

It is clear that, both in August of 1989 and at the time of trial, Dr. Hillier considered Lattimore totally disabled from performing his usual job and felt it inadvisable for Lattimore to work at all. The fact that Dr. Hillier also viewed Lattimore as capable of performing some light duty tasks does not undercut that opinion. Furthermore, Dr. Hillier's assessment is perfectly compatible with Polaroid's own definition of "total disability" because on August 23, when Lattimore was directed to return to work, he was told that, after two weeks of unspecified light duty, he would be expected to work without restriction of any kind. Thus, Lattimore was not offered work that Dr. Hillier considered him able to perform.

Moreover, in addition to Dr. Hillier's testimony and reports, there was testimony from Lattimore himself that he was physically unable to do any work because of his back injury. Thus, there was sufficient evidence to establish the "total disability" element of Lattimore's *prima facie* case. Any conflict between that evidence and conflicting medical evidence presented by Polaroid, in rebuttal, was a matter for the jury to resolve.

### B. *Pretext*

■ Lattimore's effort to prove pretext consisted principally of evidence that, in discontinuing his STD status and later terminating his employment, Polaroid deviated from its established policies and practices. Polaroid argues that any such irregularities were insufficient, as a matter of law, to prove pretext.

Most of the "deviations" cited by Lattimore amount to little more than quibbling over semantics (e.g., whether there was a "disagreement" between Polaroid and Dr. Hillier that justified Polaroid's request for an IME). However, there was evidence from which a jury reasonably could have found that the decision to discontinue Lattimore's

STD status was made before the Medical Review Board had obtained the results of Dr. Ramos' IME. As already noted, Dr. Ramos' report was not issued until approximately one week *after* the Board's decision and Williams' testimony that he learned of the results via a telephone conversation with Dr. Ramos, was contradicted by Dr. Ramos. In addition, Vincent Pina, a Polaroid director, testified that, under Polaroid's STD policy, it was unimaginable that an employee who had provided physicians' reports indicating disability would be removed from STD status before the Board reviewed the IME results.

There, also, was evidence suggesting that the results of the IME may have been preordained. If a jury determined that Williams never talked with Dr. Ramos about his findings, it could infer that, in alluding to those findings in his August 23 letter, Williams must have known, in advance of the IME, what those findings were going to be. Lattimore's testimony that the examination was a perfunctory one, although disputed by Dr. Ramos, and the evidence that Dr. Ramos did not perform any diagnostic examinations or review Lattimore's medical records could provide additional support for such an inference.

In short, although the evidence of pretext is thin, disputed and susceptible to varying interpretations, it is sufficient to create a jury question. Accordingly, since Massachusetts law provides that an employee may prevail upon proof of pretext, alone, the District Court did not err in denying Polaroid's motion for judgment as a matter of law with respect to the Chapter 151B claim.

## C. *Discriminatory Intent*

As already noted, Title VII requires proof of something more than pretext. It also requires proof of discriminatory intent. Polaroid argues that there is no evidence that its decisions to discontinue Lattimore's STD status and, later, terminate his employment, were motivated by any discriminatory intent. We agree.

Lattimore's claim of discriminatory intent is based entirely upon allegations that Mitchell was involved in the decisions and upon the fact that Polaroid's human resources admin-istrator was called to the scene when Lattimore returned to the plant on August 24 and the discussion between him and Williams apparently became heated.

As already noted, Polaroid presented evidence that the decisions at issue were made by the Board and by Montes. In support of his assertion that Mitchell participated in those decisions, Lattimore cites evidence that, until shortly before Lattimore's termination, Mitchell retained custody of Lattimore's time cards and received copies of all medical reports regarding Lattimore's physical condition. However, that evidence does not tend to prove anything other than that Mitchell may have continued to be Lattimore's "supervisor" during that period. That fact, alone, has little significance inasmuch as Lattimore was out of work and not being supervised. By itself, it is insufficient to support a reasonable inference that Mitchell participated, in any way, in the decision to remove Lattimore from STD status or to fire him. Nor does it provide any basis for concluding that any alleged racial prejudice on Mitchell's part infected those decisions.

Similarly, the fact that Florence Ramos–Jones, Polaroid's human resources administrator, was asked to participate in the discussion with Lattimore on August 24 does not establish any reasonable ground for finding that Polaroid's decision was motivated by racial animus. Lattimore argues that, because Ms. Ramos–Jones dealt with "racial issues," her participation is evidence that Polaroid viewed Lattimore's termination as a "racial matter." However, there was no evidence regarding why Ms. Ramos–Jones became involved in that discussion. If, for example, she became involved because Lattimore, himself, raised the question of racial bias, her participation would not provide any basis for inferring that Polaroid's decision was discriminatory.

In the absence of any evidence regarding Mitchell's involvement in the termination decisions or the circumstances and nature of Ms. Ramos–Jones' participation in the August 24 discussion, there is no justification for the inferential leap urged by Lattimore. Submitting the issue of discriminatory intent

to a jury on this record would amount to nothing more than an invitation to speculate. Therefore, Polaroid is entitled to judgment as a matter of law on the Title VII status discrimination claim.

## IV. *New Trial*

■ Having determined that Polaroid was entitled to judgment as a matter of law on three of Lattimore's four claims, we turn our attention to whether that determination requires a new trial. We answer that question in the affirmative because it is impossible to ascertain whether or to what extent the jury's verdict was based on the three flawed claims.

■ As already noted, the only document completed by the jury was a one page "jury questionnaire" that called upon the jury to answer three questions. Those questions asked whether Lattimore was harassed; whether any such harassment proximately caused injury to him and, if so, the amount of damages to be awarded. *See* Appendix A. Because the document was entitled "questionnaire" rather than "verdict" and because it consisted of nothing more than "written questions susceptible of categorical or other brief answer" (Fed.R.Civ.P. 49(a)), we view the jury's response as a "special verdict" within the meaning of Rule 49(a).

■ In any event, under those circumstances, it makes little difference whether the response is characterized as a general or special verdict. It is settled law that, when multiple claims are submitted to a jury and only a general verdict is returned, a new trial is required if some of the claims should not have been submitted and the jury's consideration of those claims may have affected the verdict. *Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.,* 370 U.S. 19, 29–30, 82 S.Ct. 1130, 1136, 8 L.Ed.2d 305 (1962); *see also Brochu v. Ortho Pharmaceutical,* 642 F.2d 652, 662 (1st Cir.1981). Although we know of no authority directly on point, we hold that this principle is equally applicable to special verdicts. A new trial ordinarily is required when a special verdict finding encompasses multiple facts and claims some of which should not have been submitted to the jury. In either case, it is impossible to tell whether consideration of the improperly submitted claims may have affected the verdict.

In this case, we believe the jury's verdict may have been affected by its consideration of the erroneously submitted claims. If the finding that Lattimore was "harassed" is construed to mean that the jury found for Lattimore solely on the basis of the harassment claims, the verdict was based entirely on those claims. Alternatively, if the finding of "harassment" resulted from consideration of both the harassment and the job status discrimination claims,[3] there is no way to determine whether or to what extent the harassment claims affected the verdict. In either case, a new trial is required.

## *Conclusion*

For all of the foregoing reasons we vacate the judgment entered by the District Court, reverse in part and remand the case for a new trial with respect to the job status discrimination claim asserted pursuant to Chapter 151B.

*Reversed in part, vacated in part and remanded. No costs.*

APPENDIX A
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Ollie LATTIMORE

v.                                    CIVIL ACTION 92–11547–JLT

POLAROID CORPORATION

---

**3.** The evidence presented related to both the harassment and job status discrimination claims and both types of claims were the subject of counsels' arguments and the court's charge.

## JURY QUESTIONNAIRE

1.  Has the plaintiff proved by a preponderance of the evidence that he was racially harassed by the defendant, as the court has defined that term for you?

YES_____ NO_____

If your answer to question one is "No", you need go no further. If your answer to question one is "Yes" go to the next question.

2.  Was such racial harassment a proximate cause of injury to plaintiff?

YES_____ NO_____

If your answer to question two is "No," you need go no further.

If your answer to questions one and two are "Yes", please set forth the amount of money that will fully and fairly compensate plaintiff for past, present and future suffering caused by defendant. (Write out amount in words and figures).

$_____

_____
MADAME FOREPERSON

DATED_____

---

SELYA, Circuit Judge (concurring).

I join fully in Judge Torres' comprehensive opinion. It is, however, unfortunate that neither attorney suggested that the verdict form require the jury to report the results of its deliberations count by count. Though, ordinarily, little can be gained by crying over spilt milk, past mistakes sometimes teach valuable lessons. Thus, I write separately to emphasize, for the benefit of the trial bench and bar in days to come, that the need for retrial may well have been avoided in this instance by the simple expedient of taking a separate verdict *on each statement of claim.* I commend that practice to district judges in future multi-count cases.