Linda M. KENNEY, Plaintiff

v.

MML INVESTORS SERVICES, INC., Defendant

No. CIV.A. 02–30145–MAP.

United States District Court, D. Massachusetts.

June 4, 2003.

Francis D. Dibble, Jr., Katherine A. Robertson, Bulkley, Richardson & Gelinas, Springfield, MA, for MML Investors Services, Inc.

Patricia A. Zak, Springfield, MA, for Linda M. Kenney.

*ORDER REGARDING REPORT AND RECOMMENDATION WITH REGARD TO DEFENDANT'S MOTION TO DISMISS AND FOR RULE 11 SANCTIONS*

(Docket Nos. 3 and 53)

PONSOR, District Judge.

Upon *de novo* review, the Report and Recommendation of Magistrate Judge

Kenneth P. Neiman dated May 7, 2003 is hereby adopted, without objection. The defendant's Motion to Dismiss (Docket No. 3) is ALLOWED, in part; the Motion for Sanctions (Docket No. 5) is DENIED. The clerk will set the case for a pretrial scheduling conference.

It is So Ordered.

*REPORT AND RECOMMENDATION WITH REGARD TO DEFENDANT'S MOTION TO DISMISS AND FOR RULE 11 SANCTIONS (Document Nos. 3 and 5)*

NEIMAN, United States Magistrate Judge.

MML Investors Services, Inc. ("Defendant") moves pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6) to dismiss Linda Kenney ("Plaintiff")'s employment discrimination complaint. In essence, Defendant argues that Plaintiff failed to exhaust her administrative remedies as to the bulk of her causes of action and that, in any event, many of those same causes of action fail to state claims upon which relief may be granted. Defendant also moves for sanctions pursuant to Fed.R.Civ.P. 11, alleging that it "should not have been required to incur the costs of filing a motion to dismiss claims that clearly were barred by well-established principles of law." (Document No. 5 (hereinafter "Defendant's Rule 11 Brief") at 1.) Both motions have been referred to this court for a report and recommendation. *See* 28 U.S.C. § 636(b). For the reasons described below, the court will recommend that Defendant's motion to dismiss be allowed in large measure, but that its motion for Rule 11 sanctions be denied.

### I. MOTION TO DISMISS STANDARDS

Rule 12(b)(1) empowers a party to seek dismissal of an action for "lack of jurisdiction over the subject matter" and Rule 12(b)(6) allows a complaint to be dismissed for "fail[ing] to state a claim upon which relief can be granted." Both rules require the court to construe all of the complaint's allegations in favor of Plaintiff, the non-moving party. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Negron–Gaztambide v. Hernandez–Torres,* 35 F.3d 25, 27 (1st Cir.1994).

### II. BACKGROUND

The following facts are alleged either in the complaint or in official administrative records supplied by the parties without objection. *See Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.,* 267 F.3d 30, 33 (1st Cir.2001) ("In ruling on a [Rule 12(b)(6)] motion to dismiss, ... [while,] [o]rdinarily, a court may not consider any documents that are outside of the complaint[,] ... [t]here is ... a narrow exception for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs claim; or for documents sufficiently referred to in the complaint.") (citations and internal quotation marks omitted). *See also Gonzalez v. United States,* 284 F.3d 281, 288 (1st Cir.2002) ("[T]he court may consider ... materials [outside the pleadings] on a Rule 12(b)(1) motion.").

According to the complaint:

5. [Plaintiff] was employed by [Defendant] from July 13, 1998, having "transferred" from the "home office" of Massachusetts Mutual Life Insurance, to January 3, 2001.

6. [Plaintiff]'s job performance was generally satisfactory.

7. [Plaintiff] is a female of African-American and Seminole descent.

8. [Plaintiff]'s initial position with [Defendant] was as a "Senior Office Assistant" at a base annual salary of $18,500.

9. Prior to accepting the aforesaid position, [Plaintiff] was informed by [Defendant's] management that its duties included tasks that represented an advancement over her present position with opportunities to learn and advance in the brokerage field. She accepted the position in part because of these opportunities.

10. Instead, immediately upon entering into the position of "Senior Office Assistant," [Plaintiff] was taken to a windowless back room and instructed to complete a huge arrearage of filing. For months, she did almost nothing else. No white male employee was so restricted.

11. When she complained about being used solely as a file clerk, her supervisor, David Deonarine, told her to quit if she was unhappy. She took her concerns to Valerie Williams of Human Resources and was promised a meeting with management and Deonarine, but no such meeting ever took place. Instead, Deonarine told her to "stick to filing."

12. In 1999, another employee, New Account Specialist Michelle Bjorge, began training [Plaintiff] in New Account duties. New Account Specialist was a higher-ranking and better-paid position than [Plaintiff]'s, and Ms. Bjorge advised that there would be an opening for another New Account Specialist and that she would recommend [Plaintiff] for the position. New Accounts Manager Michael Perez also told her that he would recommend her.

13. In September 1999, Ms. Bjorge took a three-week leave and, per her recommendation, [Plaintiff] filled in for her. [Plaintiff]'s performance in this position was satisfactory and her supervisor, Mr. Deonarine, complimented her on her work. However, although [Plaintiff] worked intermittently as a New Ac-counts Specialist even after Ms. Bjorge's return, she was never promoted to or paid for the position. An individual who was not African–American was eventually given the position.

14. When [Plaintiff] asked about permanent placement into a New Account Specialist position, David Deonarine publicly ridiculed her abilities and threatened to "throw her back into the files." Deonarine even made such remarks in front of [Plaintiff]'s young son on "Bring Your Son to Work" Day. Mr. Deonarine's ridicule continued to the end of [Plaintiff]'s employment. Male non-African-American employees were not subjected to similar treatment.

15. On or about November 15, 1999, [Plaintiff] interviewed for a promotion position that she was led by management to believe was the New Account Specialist position or an identical position. After she accepted the job, she learned that it was, in fact, that of "Securities Brokerage Technician," which was less well paid. In addition, [Plaintiff] was actually paid one thousand dollars per year less than the original job posting had promised for the position. When she complained to Human Resources, the job posting was altered after the fact to reflect the lower rate.

16. In her January 2000 review, it was noted that [Plaintiff]'s "objective" was to obtain her Series 6 broker's license by May 2000. [Plaintiff] was subsequently penalized financially, downgraded on her evaluations (the last occasion being her December 31, 2000 review), and told that she was ineligible for promotion for lack of a Series 6 license. However, non-African-American co-workers in the same position were not penalized despite not having the license; nor were New Account Specialists. White employees

were promoted without regard to licensure.

17. In late December 2000, [Plaintiff] learned for the first time that two white co-workers in "Securities Brokerage Technician" positions, with no more experience, without Series 6 licenses, and doing identical work, had been started at base salaries that were thousands of dollars higher than hers. The same was true of an Asian employee whom [Plaintiff] had actually trained in both New Accounts work and the Technician position.

18. In frustration, distraught over the continual belittlement of her supervisor, and despairing of ever receiving equitable treatment despite her attempts to enlist Human Resources, [Plaintiff] resigned, working her last day on January 3, 2001.

(Complaint ¶¶ 5–18.)

In October of 2001, nine months after Plaintiff left Defendant's employ, she contacted the Equal Employment Opportunity Commission ("EEOC"). (See *id.* ¶ 19; Document No. 4 (hereinafter "Defendant's Dismissal Brief"), Exhibit 1.) A one page EEOC "Notice of Charge" was sent to Defendant on October 12, 2001. (Defendant's Dismissal Brief, Exhibit 1.) The notice indicated that the basis of Plaintiff's charge was discrimination because of "color," the box for that classification having been checked. (*Id.*) Boxes for discrimination based on "race," "sex," "religion," "nat[ional] origin," "age," "disability," "retaliation" and "other" were not checked. (*Id.*) According to the notice, the "earliest" violation of law was alleged to have occurred on "12/24/00," the same date that the "most recent" violation was also alleged to have occurred. (*Id.*)

On November 9, 2001, Plaintiff signed, under oath, a verified charge of discrimination. In describing the "cause of discrimi-

nation," again only the "color" box was checked. (*Id.*, Exhibit 2.) The following "particulars" were then provided:

I. + On or about January 11, 2001 I constructively discharged [sic] from my position with [Defendant].

II. + I believe that I have been subjected to discrimination on the basis of my race, Black and Seminole Indian, and subjected to lesser wages than my peers.

III. + I believe that I have been discriminated against in violation of Title VII of the Civil Rights Act of 1967[sic], as amended, and the applicable state laws in that I was forced to constructively discharged [sic] and given lesser wages by my employer.

(*Id.*) Like the initial notice, the verified charge indicates that the alleged discrimination began and ended on December 24, 2000. (*Id.*)

On December 11, 2001, Defendant filed a position statement and affidavit with the EEOC in which it requested that Plaintiff's charge be dismissed. (Defendant's Rule 11 Brief, Exhibits C and D.) The EEOC did just that six months later. In a letter to Plaintiff dated June 10, 2002, the EEOC noted that Plaintiff had "allege[d] that due to [her] race, Black and Seminole Indian," she was "subjected to lesser wages and forced to constructively discharge in violation of Title VII." (*Id.*, Exhibit E.) The letter stated that the EEOC was dismissing Plaintiff's charge because "there [was] no evidence to suggest that [Defendant] subjected [Plaintiff] to lesser wages due to [her] race" and "no evidence to suggest that conditions were so intolerable that [Plaintiff] was forced to leave [Defendant]'s employ." (*Id.*)

The instant complaint, which Plaintiff filed on September 9, 2002, has four counts. In Count I, captioned "Racial Dis-

crimination," Plaintiff claims that Defendant's actions constituted harassment and disparate treatment on the basis of race in violation of Title VII of the Civil Rights Act of 1964, ("Title VII"), 42 U.S.C. § 2000e et seq. In Count II, captioned "Gender Discrimination," Plaintiff claims that Defendant's actions constituted harassment and disparate treatment "on the basis of [Plaintiff's] race [sic]" (presumably, Plaintiff means "gender") in violation of Title VII. In Count III, captioned "Wrongful Discharge," Plaintiff claims that Defendant's actions constituted "constructive discharge on the basis of race and/or gender" in violation of Title VII. In Count IV, captioned "Retaliation," Plaintiff claims that Defendant's actions constituted Title VII retaliation against her for attempts to assert her rights "in the face of racial and sexual discrimination."

### III. Defendant's Motion to Dismiss

In its motion to dismiss, Defendant makes a jurisdictionally-based "exhaustion" argument and a merits-based argument. The court will discuss each in turn. In the end, the court believes that Plaintiff's gender discrimination and retaliation claims (Counts II and IV) should be dismissed in full, whereas her racial discrimination and wrongful discharge claims (Counts I and III) should survive, but only insofar as those claims allege race-based "job status" discrimination or constructive discharge.

### A. Jurisdiction

Defendant first argues that the only part of Plaintiff's complaint which is administratively exhausted is that part of Count I alleging unequal remuneration because of race, i.e., her race-based "job status" claim. Thus, Defendant contends that the rest of the complaint—to wit, Count II (alleging both "job status" and "hostile environment" gender discrimination), Count III (alleging constructive discharge), Count IV (alleging retaliation) and the remainder of Count I (alleging "hostile environment" race discrimination)—ought to be dismissed under Rule 12(b)(1). For her part, Plaintiff argues that the entire complaint is adequately exhausted. In the court's estimation, neither party is entirely correct.

### 1. Legal Background

As a predicate to bringing a civil action in court, Title VII requires a complainant to first file an administrative charge with the EEOC setting forth the claim and its factual basis. *See Clockedile v. New Hampshire Dep't of Corrections,* 245 F.3d 1, 6 (1st Cir.2001). The exhaustion requirement exists to "protect[ ] employers from the disruption and expense of responding to a claim unless a complainant is serious enough and sure enough to support it by oath subject to liability for perjury." *Edelman v. Lynchburg College,* 535 U.S. 106, 122 S.Ct. 1145, 1149, 152 L.Ed.2d 188 (2002). Failure to adequately set forth a discrimination claim at the agency level generally warrants dismissal for lack of jurisdiction. *See, e.g., Lattimore v. Polaroid Corp.,* 99 F.3d 456, 464 (1st Cir.1996).

Title VII specifically requires that a charge of discrimination filed with the EEOC "be in writing under oath or affirmation." 42 U.S.C. § 2000e–5(b). Last term, the Supreme Court twice reaffirmed the importance of compliance with this requirement. *See Edelman,* 122 S.Ct. at 1147–48; *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 2070, 153 L.Ed.2d 106 (2002). According to the Court, Title VII "demands an oath ... by the time the employer is obliged to respond to the charge." *Edelman,* 122 S.Ct. at 1149.

Even so, as the Court of Appeals for the First Circuit has recently explained, "Title VII does not say explicitly that the court suit must be limited to just what was alleged in the agency complaint." *Clockedile*, 245 F.3d at 4. "[T]he courts," the First Circuit continued, "while assuming that some kind of a relationship must exist, have sometimes allowed court claims that go beyond the claim or claims made to the agency, and sometimes not. The outcomes and rationales vary markedly where the claimant offers new incidents of documentation or an entirely new theory." *Id.* (citing, as examples, *Taylor v. Western & Southern Life Ins. Co.*, 966 F.2d 1188, 1195–96 (7th Cir.1992), and *Antol v. Perry*, 82 F.3d 1291, 1295–96 (3d Cir.1996)).

### 2. *Analysis of Parties' Arguments*

As mentioned, Defendant does not seek to dismiss on exhaustion grounds that part of Count I which raises a race-based claim of job status discrimination. Defendant, however, does challenge on exhaustion grounds all the remaining claims, including that part of Count III which alleges constructive discharge on the basis of race. In the court's view, Defendant's challenge to the job status part of the constructive discharge claim is misplaced.

■ It is clear that Plaintiff's verified EEOC charge, pursued *pro se,* raised a constructive discharge claim based on race stemming from the alleged wage differential. Not only did Plaintiff check the "color" box on the EEOC form, but she provided "particulars" which twice mention constructive discharge. Defendant's argument to the contrary, this was more than sufficient notice to Defendant of the race-based, job status component of Plaintiff's purported constructive discharge. *See Lattimore* 99 F.3d at 464 ("where, as here, the employee acts *pro se,* the administrative charge is liberally construed in order

to afford the complainant the benefit of any reasonable doubt."). Indeed, even the EEOC's dismissal letter addressed Plaintiff's constructive discharge allegations.

■ In contrast, the other causes of action which Plaintiff now wants to pursue— i.e., her claims of racial harassment (the rest of Count I), gender discrimination based on harassment and disparate treatment (Count II), constructive discharge based on racial harassment or gender discrimination (the rest of Count III), and retaliation (Count IV)—cannot, in the court's estimation, fairly be said to have been raised in her verified EEOC charge. In other words, the court believes that Plaintiff ought to be limited to the four corners of her charge and, therefore, that these other causes of action should be dismissed as unexhausted.

To be sure, there is some merit to Plaintiff's argument that the case law does not mandate a rigid approach to reviewing EEOC charge documents. For example, the First Circuit held in *Clockedile* that certain "retaliation claims are preserved so long as the retaliation is reasonably related to and grows out of the discrimination complained of to the agency—e.g., the retaliation is for filing the agency complaint itself." *Id.,* 245 F.3d at 6. The First Circuit also observed in *Lattimore* that the scope of a civil complaint, while " 'limited by the charge filed with the EEOC,' " may also include " 'the investigation which can reasonably be expected to grow out of that charge.' " *Id.,* 99 F.3d at 464 (quoting *Powers v. Grinnell Corp.*, 915 F.2d 34, 38 (1st Cir.1990)).

Closer examination of these exceptions, however, reveals that they are inapplicable here. With respect to the retaliation exception described in *Clockedile*, the First Circuit was concerned with retaliatory conduct which arises *after,* if not as a result of, an employee's invocation of the EEOC

process. Such retaliation, the First Circuit explained, "uniquely chills remedies; and by retaliating against an initial administrative charge, the employer discourages the employee from adding a new claim of retaliation." *Id.* at 5 (citing *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1312 (7th Cir.1989)). Here, in contrast, Plaintiff's retaliation cause of action concerns events which took place *before* her departure and which were in no way connected to the filing of her administrative charge some nine to ten months after she left Defendant's employ. Accordingly, the *Clockedile* retaliation exception does not apply.

As to Plaintiff's other claims, *Lattimore* is instructive as to both the law and the facts as they exist here. Addressing a situation not unlike the one presently before the court, the First Circuit explained that the purpose of requiring an employee to pursue an administrative charge before filing suit is "to provide the employer with prompt notice of the claim and to create an opportunity for early conciliation." *Id.*, 99 F.3d at 464. "That purpose would be frustrated," the First Circuit continued, "if the employee were permitted to allege one thing in the administrative charge and later allege something entirely different in a subsequent civil action." *Id.* "Consequently," the First Circuit concluded, "'the scope of the civil complaint is limited by the charge filed with the EEOC and the investigation which can reasonably be expected to grow out of that charge.'" *Id.* As for the particular facts in the case before it, the court concluded that Lattimore's administrative charge related solely to employment decisions made by Polaroid and could not reasonably be construed to include the harassment charges which he sought to pursue in his judicial complaint. *Id.* In addition, the court found that the harassment claims were not reasonably within the scope of the agency investigation. *Id.*

Applying the same analysis here, the court is constrained to conclude that most of Plaintiff's present claims are jurisdictionally barred for failure to exhaust. For one thing, as Plaintiff must admit, her verified charge is limited by its very language to "discrimination" and "constructive discharge[ ]" based on "race" as they relate to her receipt of "lesser wages." In this regard, Plaintiff's charge is more circumscribed than the charge at issue in *Lattimore*, where even the use of the word "harassment" was not sufficient to expand the job status employment discrimination claim based on race to a hostile environment harassment claim based on race. In addition, the EEOC's dismissal of Plaintiff's claims in the case at bar, much like the administrative notice of final disposition in *Lattimore*, reveals that the scope of the investigation was limited—as was the verified charge—to disparate pay allegations based on race and a constructive discharge related thereto. In short, it cannot be said that the additional claims which Plaintiff now seeks to pursue were reasonably within the scope of the EEOC's actual investigation. *See Lattimore*, 99 F.3d at 464–65 ("When [an investigation] is launched in response to a charge of employment discrimination, the direction and scope of the investigation are guided by the allegations contained in the charge. Although an investigation is not strictly confined to allegations in the charge, it is not a 'fishing expedition' that should be expected to extend to matters unrelated to the charge.").

Granted, Plaintiff now avows that her EEOC caseworker orally assured her that "if the case went to court, [she] could 'expand' [her complaint] to bring in the incidents regarding gender, etc." (See Affidavit of Linda M. Kenney (hereinafter "Plaintiff's Affidavit"), attached to Document No. 10 (hereinafter "Plaintiff's

Brief"), ¶ 8.) Plaintiff, however, has provided no documentary support to substantiate this self-serving allegation. Even if she had, the court would be unable to credit this oral "evidence":

> Unlike written documentation, . . . oral representations have a different character in that they are not verifiable and do not offer a lasting representation of the claimant's case. Otherwise, . . . a Title VII claimant could press any claim in a lawsuit as long as she represents that she discussed the claim with an EEOC employee. Such an exception to the scope-of-the-charge requirement would swallow the rule.

*Talbot v. U.S. Foodservice,* 204 F.Supp.2d 881, 885 (D.Md.2002) (citation and internal quotation marks omitted). *See also Davis v. Lucent Tech.,* 251 F.3d 227, 234–35 (1st Cir.2001) (refusing to credit "vague allegation" that the EEOC had refused to let the complainant introduce evidence administratively); *Conaway v. Control Data Corp.,* 955 F.2d 358, 363 (5th Cir.1992) ("It would be virtually impossible for the EEOC or a defendant to rebut a plaintiff's unsupported allegation that the EEOC provided incomplete information in a telephone conversation."). Plaintiff essentially conceded the point at oral argument.

Finally, Plaintiff argues that, under *Stephenson v. State Street Bank & Trust Co.,* 924 F.Supp. 1258 (D.Mass.1996), written documents she sent to the EEOC expanded the investigation to cover harassment, gender discrimination and retaliation and that these documents can reasonably be read into the scope of her verified charge. In essence, Plaintiff contends, the scope of her civil action should not be determined by the agency charge or, indeed, the actual administrative investigation, but what the EEOC "was given the opportunity to do." *Stephenson,* 924 F.Supp. at 1276. *See also Ianetta v. Putnam Investments, Inc.,* 142 F.Supp.2d 131, 134 (D.Mass.2001); *Conroy v. Boston Edison Co.,* 758 F.Supp. 54, 58 (D.Mass.1991). The EEOC, Plaintiff argues, merely had to have be informed of her claims during the period of its investigation for those claim to form the basis of her ensuing judicial complaint.

Plaintiff's final argument falls short in several ways. First, as *Stephenson* itself acknowledges, courts need to "pay particular attention to the factual statement contained in the charge," *id.,* 924 F.Supp. at 1276; here, the claims set forth in Plaintiff's charge were significantly limited. Second, the scope of the EEOC's investigation, as reflected in its dismissal notice, was more circumscribed than Plaintiff might now wish; the agency addressed only Plaintiff's disparate pay allegations based on race and the related constructive discharge claim. Third, as Plaintiff concedes, Defendant was not privy to the documents she allegedly sent to the EEOC and, thus, did not have an opportunity to respond to them; it would significantly stretch the scope of the investigation rule to force a defendant to confront allegations in court that it was not in fact able to challenge administratively.

Fourth, even if the court were to permit Plaintiff to rely on documents she submitted to the EEOC, they do not help her. There are virtually no substantive allegations in those documents with respect to a number of claims Plaintiff now seeks to pursue before the court. For example, there are no allegations in the documents of hostile comments based on race. Nor are there any allegations that could be construed as supporting a claim of discrimination because of sex in the terms and conditions of Plaintiff's employment. Yet other claims which go beyond the verified charge are so deeply embedded in the documents as to be unrecognizable. For example, only the October 4th document

contains anything hinting at a hostile work environment based on gender and those allegations are extremely thin.[1]

At bottom, the proffered documents can hardly be said to comply with the *Lattimore* court's admonition that, for a claim to fall within the scope of the investigation, a plaintiff must "describe the essential nature of the claim and ... identify the core facts upon which it rests." *Id.*, 99 F.3d at 464. As explained, the only claims which the court believes survive the exhaustion requirement are that part of Count I which raises a disparate wage (i.e., job status) claim based on race and that part of Count III which raises a constructive discharge claim on similar grounds.

### B. MERITS

Defendant also argues that, except for that part of Count I which alleges job status discrimination based on race, the complaint fails to state claims upon which relief may be granted and ought to be dismissed pursuant to Rule 12(b)(6). In particular, Defendant asserts that (1), with respect the hostile environment and constructive discharge claims, "severe or pervasive" harassment has not been pled and (2), with respect to the retaliation claim, the complaint does not allege that Plaintiff engaged in conduct protected by Title VII.

Because the court believes that it lacks jurisdiction over all but the specific parts of Count I and III previously described, it is only necessary to address Defendant's Rule 12(b)(6) argument with respect to the claim of constructive discharge based on race set forth as part of Count III. As indicated, Defendant, at this junction, does not challenge that part of Count I which asserts a disparate treatment claim based on race.

 Unfortunately, Defendant's Rule 12(b)(6) argument that Plaintiff's constructive discharge claim is deficient is too brief to be of much assistance to the court. Moreover, Defendant approaches the discharge claim as if it is inextricably intertwined with a hostile environment. That might often be the case in the context of a claim for retaliation. *See, e.g., Landgraf v. USI Film Prods.*, 968 F.2d 427, 430 (5th Cir.1992) ("To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile work environment.") (cited in *Hernandez–Torres v. Intercontinental Trading, Inc.*, 158 F.3d 43, 48 (1st Cir. 1998)). That is not the situation here, however. Plaintiff's constructive discharge claim, as the court understands it, grows out of her job status claim based on race. What Plaintiff must ultimately prove with respect to her discharge is that her working conditions, i.e., the disparate wages she was allegedly receiving, were so difficult or unpleasant that a reasonable person in her shoes would have felt compelled to resign. *See Calhoun v. Acme Cleveland Corp.*, 798 F.2d 559, 561 (1st Cir.1986). *See also Landrau–Romero v. Banco Popular De Puerto Rico*, 212 F.3d 607, 613 (1st Cir.2000) (to establish constructive discharge, "the plaintiff must prove that his employer ignored working

---

1. Specifically, Plaintiff alleges only a few episodes of strange conduct by her supervisor in 1998 and 1999. For example, on July 14, 1998, the supervisor was "staring" at Plaintiff "from a distance" and "would make grunting and whistling noises at [her] if he was behind [her] walking down the hall." (Plaintiff's Brief, Exhibit A.) Then in February of 1999, when Plaintiff "was leaving the copier," the supervisor would stay "behind [her] silently whistling and making grunting like noise." (*Id.*) Finally, once in February of 1999, when Plaintiff worked overtime, the supervisor "stayed behind[,] ... staring at [her] from a distance." (*Id.*)

conditions so intolerable that a reasonable person would feel compelled to forsake his job rather than to submit to looming iniquities"). Defendant, however, has not adequately addressed this type of constructive discharge, and the court is unable to say on its own that Plaintiff's complaint fails to state such a claim for which relief would be available. Accordingly, to the extent Defendant seeks dismissal based on Rule 12(b)(6), the court suggest that its motion be denied.

## IV. DEFENDANT'S MOTION FOR RULE 11 SANCTIONS

■ Defendant argues that Rule 11 sanctions are warranted because "[a]ny reasonable inquiry would have shown, based on well-established and unambiguous precedent, that the majority of the claims in the Complaint would not survive a motion to dismiss." (Defendant's Rule 11 Brief at 5.) In a one sentence response, Plaintiff asserts that, since her "complaint is grounded on existing law, there is no basis for awarding sanctions in this matter." (Plaintiff's Brief at 12.)

Although, as described, the court believes that much of the complaint ought to be dismissed, it deems Rule 11 sanctions unwarranted. Defendant moved for sanctions before Plaintiff even tendered her opposition to the motion to dismiss, an opposition that attached documents (until that point withheld from Defendant) which Plaintiff had submitted to the EEOC. These documents were reasonably relied upon by Plaintiff in opposing dismissal and could well have formed the basis for the expansive nature of her complaint. In addition, Plaintiff's opposition was supported by an affidavit in which she averred, under oath, that she had alleged to the EEOC that she had been "discriminated against on the basis of [her] color and gender, and retaliated against when [she] attempted to bring these facts to the attention of company management." (Plaintiff's Affidavit ¶¶ 2, 8.) While, in the end, the court has rejected these proffers, it appears that, even under the lead case cited by Defendant, Plaintiff's counsel's "prefiling investigation of law and fact [was not] objectively [un]reasonable under the circumstances." *Harmon v. O'Keefe,* 149 F.R.D. 114, 116 (E.D.Va.1993).

## V. CONCLUSION

For the foregoing reasons, the court recommends that Defendant's motion to dismiss be DENIED insofar as it targets those portions of Counts I and III alleging race-based, job status discrimination or constructive discharge, but otherwise ALLOWED. The court also recommends that Defendant's motion for Rule 11 sanctions be DENIED.[2]

DATED: May 7, 2003.

**2.** The parties are advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within ten (10) days** of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation. *See Keating v. Secretary of Health & Human Services,* 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete,*

792 F.2d 4, 6 (1st Cir.1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir.1983); *United States v. Vega*, 678 F.2d 376, 378–379 (1st Cir.1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir.1980). *See also Thomas v. Arn*, 474 U.S. 140, 154–55, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). A party may respond to another party's objections within ten (10) days after being served with a copy thereof.