Jan SWALLOW, Plaintiff, Appellant,

v.

FETZER VINEYARDS, Brown–Forman Corporation, and William Cascio, Defendants, Appellees.

No. 01–2011.

United States Court of Appeals,
First Circuit.

Sept. 3, 2002.

Laura R. Studen, with whom Lawrence P. Murray, Nancy A. Newark, and Burns & Levinson LLP, were on brief, for appellant.

Mary E. O'Neal, with whom Patricia A. Granger, and Masterman, Culbert & Tully LLP, were on brief, for appellees.

Before LYNCH, Circuit Judge, BOWNES, Senior Circuit Judge, and MAGILL,* Senior Circuit Judge.

BOWNES, Senior Circuit Judge.

Plaintiff-appellant Jan Swallow asserted claims of gender discrimination under Mass. Gen. Laws ch. 151B, § 4, against her former employers, defendant-appellees Fetzer Vineyards, Brown–Forman Corporation and William Cascio. The United States District Court for the District of Massachusetts awarded summary judgment to defendants, holding that Swallow had failed to satisfy various procedural and evidentiary standards.[1] We affirm the judgment below.

## I. BACKGROUND

### A. Factual background

#### 1. The Factual Record on Appeal

■ An initial question presented in this appeal is what constitutes the record facts. The district court held that Swallow failed to comply with Local Rule 56.1, which requires parties opposing motions for summary judgment to submit "a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation." Accordingly, the court deemed admitted most of defendants' statement of material facts. *See* L.R. 56.1

("Material facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties."). We review this determination for abuse of discretion. *CMM Cable Rep, Inc. v. Ocean Coast Prop., Inc.,* 97 F.3d 1504, 1528 (1st Cir.1996).

In its opinion, the district court simply set forth verbatim the defendants' statement of purportedly undisputed facts, stating in a footnote that it did not "accept characterizations of those undisputed facts ... at face value. We leave to others the task of characterizing the events leading up to the discharge of plaintiff ..." In another footnote, the court identified three factual assertions as disputed within the meaning of Fed.R.Civ.P. 56, and dispensed with them as non-material.

We agree with the district court that Swallow's statement of material facts was not a model of clarity. She set forth her version of the facts without explicitly distinguishing between those that were material or non-material, disputed or undisputed. *See Corrada Betances v. Sea–Land Serv., Inc.,* 248 F.3d 40, 43–44 (1st Cir. 2001) (opposing party's filing of a "Counterstatement of Uncontested Material Facts" in response to a motion for summary judgment, which included a statement of material facts to which the moving party contended there was no genuine issue to be tried, did not fulfill opposing party's obligation under the local rule). Although we decline to hold that the district court abused its discretion in sanctioning Swallow, we do not find the district court's approach useful for purposes of the

---

* Of the Eighth Circuit, sitting by designation.

1. The case was assigned to a magistrate judge for all purposes, including trial and entry of final judgment.

complex factual analysis this case requires. Thus, we have attempted to parse the record and set forth the facts as favorable to Swallow as her filings permit. *See Filiatrault v. Comverse Tech., Inc.,* 275 F.3d 131, 134 (1st Cir.2001) (in usual review of summary judgment decision, appeals court sets forth facts in light most favorable to non-movant).

### 2. *Swallow's Hiring and Promotion*

Swallow first began working with Fetzer Vineyards in 1983 as an independent contractor. Approximately one year later, she was hired as a Fetzer employee in the position of New England Regional Manager. In 1989, Fetzer hired defendant Cascio as Vice President Division Manager. In 1991, Swallow was promoted to New England/Ohio Regional Manager. That same year, Fetzer also promoted Cascio to Executive Vice President, National Sales Director, leaving the Northeast Division Manager position vacant.

Swallow initially expressed interest in the Northeast Division Manager position in 1991. She and Cascio discussed whether she would be willing to relocate to the New York area as a part of this promotion; Swallow expressed her preference for working out of the Boston area. In January 1992, Ed McLaughlin was hired from outside the company to fill the vacant Northeast Division Manager position. After four months, he voluntarily left the company for a position at a Fetzer distributor.

The position was vacant until November 1992, when Swallow was promoted into it. She was the only female Division Manager out of eight employed at Fetzer. Swallow asked to set up an office in the Boston area with an administrative assistant. Fetzer denied this request, but allowed her to work out of her home in Chelsea, Massachusetts, and spend a few days every few weeks in the New Jersey office.

At the time of her promotion, Swallow did not receive the title of "Vice President," though all other Division Managers at the time had this title. Cascio explained that Swallow received the promotion at a time of transition when Fetzer was being consolidated with the Brown–Forman Corporation; because the two companies used the title differently, Cascio did not authorize the title until the issue of uniformity had been settled in the benefits department. Swallow contends that at the time she was given the promotion, Cascio told her they would have to wait and "see how it goes" before giving her the title. In February 1993, Cascio informed her she would be given the title.

### 3. *Complaints Against Swallow*

Around January or February 1993, Andrew Fromm became Senior Vice President National Sales Director and began supervising Division Managers, including Swallow. Fromm reported to Cascio on Division Managers' performance.

On January 25, 1993, Judi Villiani, an administrative assistant who reported directly to Swallow, resigned from Fetzer. Her resignation letter cited "conflicting personalities" between Swallow and herself as the reason for resigning.

In late 1993 and early 1994, Fromm and Cascio received several complaints from retailers and distributors about their interactions with Swallow. Specifically, Cascio received phone calls from five different distributors after Swallow had met with them. One distributor, Mat Margolis of Kronheim, described her style as aggressive and confrontational. Another distributor, Jim Deihl of Jameson Cross, complained to Cascio and Fromm that she had a confrontational, autocratic, and demeaning management style. On one occasion

he threatened to discontinue representing the Fetzer brand if Swallow continued to personally call on him. Following these complaints, Cascio and Fromm decided to move the Ohio region out of the Northeast Division, Swallow's area of management.

The record indicates that Swallow disclosed confidential corporate information on two occasions. In August or September of 1993, Swallow informed a distributor, Spatola Wine and Spirits, that Fetzer was considering discontinuing its relationship. She did this before Cascio and Fromm had the opportunity to officially notify Spatola of the decision. In the summer or early fall of 1993, Swallow disclosed to James Chatfield of Peerless, a Fetzer distributor in New York, that Fetzer planned to meet with one of Peerless's competitors, Colony Distribution. Fetzer deemed these negotiations confidential and Swallow's disclosure inappropriate and unauthorized.[2]

Other Fetzer employees also complained to Fromm about Swallow. In May 1993, four employees of the Northeast Division approached Cascio and Fromm with regard to the "demoralizing and degrading" manner in which Swallow treated them. They stated that Swallow "spoke down to them—much as a teacher would to a child," and that they would not be able to continue working at Fetzer if conditions did not change. Fromm's notes memorializing the meeting with these employees indicated that he and Cascio had addressed the complaints with Swallow.

Still, in August and September, the same employees complained that the problems with Swallow had not improved.

Specifically, Debbie Ascoli and Jim Russo, sales managers working below Swallow, had reported to them that Swallow had told them she did not support the sales awards they received at a National Sales meeting. Sally Dodd, a District Sales Manager, reported that Swallow had told her not to speak to Cascio and Fromm about any problems she had with Swallow.

In December, 1993, Swallow took a management course at Boston University to help with listening skills and problem-solving. She also viewed a training video from Brown–Forman's library, as suggested by Cascio, and reviewed a list of other available training materials, but said she did not believe that anything else would be useful to her. Also on Cascio's suggestion, she implemented a "180 degree management style ... where you ask for input from your team on how you're doing as well as evaluating them."

Swallow received performance appraisals from Fromm in February 1994 and June 1994. In February, her "Delegation & Working Relationships" rating was "improvement desired."[3] It stated: "Her working relationships with team members, however, continue to be adversarial, creating on-going conflicts within her division.... Jan must recognize her weakness in this area and take steps to pull her team together." Her "Communication Skills"

---

2. In a footnote in her Memorandum in Opposition to Summary Judgment, Swallow denied that she made the disclosure to Spatola Wine and Spirits. This is belied by a memo she wrote following an October 1993 meeting with Fromm concerning these disclosures: "The business with Spatola and Colony have been learning experiences. My timing of relaying of information was not appropriate in the short term."

3. Performance evaluations were given in six categories, as well as an overall rating. Possible ratings were excellent, very good, satisfactory, improvement desired, or improvement essential. Her February 1994 overall rating was "satisfactory," with her Delegation & Working Relationships rated "improvement desired" and five other categories rated "satisfactory."

were evaluated as "satisfactory," but the evaluation stated: "Jan needs to focus on improved verbal communication skills, as she comes across as combative, overly aggressive, and in some cases, as 'talking down' to the other party. This is particularly evident when negotiating with distributor principles, and when providing direction to her subordinates."

In her June evaluation, Swallow showed some improvement.[4] Her "Delegation and Working Relationships" evaluation section stated, "Jan has made a noticeable improvement in the way she leads her team. Her management style has become less autocratic and more focused on a positive leadership style." Fromm noted in an "Other Comments" section, "I have seen solid improvement in the way Jan manages her division, particularly relative to her communication/leadership style. With Jan's continued focus on her division's operations, I am confident of her success."

Shortly after the June evaluation, Fromm, Swallow, and Rick Palermino, one of Swallow's subordinates, were leaving an airport together. Swallow insisted that Fromm accompany her, but he instead rode with Palermino. Palermino later informed Fromm that Swallow had questioned him about the substance of their conversation and threatened him with regard to further communication with Fromm.

In mid-August, Ascoli informed Fromm and Karen Boudrie, Fetzer's Human Resource Manager, that her work environment had become intolerable because of Swallow's management style and she was resigning from Fetzer.[5] She said her decision was precipitated by an incident with Swallow a few days earlier. The two of

them had been working on a memo regarding an issue with another employee. When a draft of the memo arrived on the fax machine to the New Jersey office where Ascoli was working, she saw it stated incorrectly which territory the employee handled. She made the correction before giving it to Jackie Alston, the administrative assistant for the Northeast Division, to be typed. Ascoli asked Alston to inform Swallow of the correction. Ascoli stated to Fromm and Boudrie that Swallow then called her and was very angry. She said words to the effect of "how dare [you] touch one of [my] telefaxes," and said Ascoli was forbidden from using the fax machine. Fromm and Boudrie convinced Ascoli to stay on at Fetzer.

Swallow attributed some of the problems with Ascoli to Ascoli's having wanted the promotion to Northeast Division Manager that was given to Swallow. She also argues that when Ascoli tried to resign under Swallow's male successor, Fromm did not try to persuade her to stay, as he had when she worked for Swallow.

### 4. *Swallow's Termination*

The Ascoli incident precipitated discussion among Fromm, Cascio, and Boudrie as to whether Swallow should be terminated. On August 12, 1994, Fromm and Boudrie spoke with Dodd regarding Swallow. Dodd described the situation with Swallow as intolerable, and stated that Swallow isolated her from upper management. She also reported other instances of conflict with distributors and retailers who had been angered by Swallow's behavior and threatened to pull their business if she continued meeting with them.

---

4. Her June 1994 overall rating was "satisfactory" with four category ratings of "satisfactory" and four ratings of "very good."

5. Ascoli had been employed at Fetzer since 1989.

Within a few days, Jackie Alston also resigned. According to Fromm and Boudrie, she attributed her leaving Fetzer to her inability to work with Swallow. She reported to them that even though she did not have another job, the situation with Swallow was too intolerable to stay. In contrast, Swallow stated that Alston reported to her that she was resigning due to Fetzer's failure to increase her salary and her need to spend time with her much younger sister.

Cascio, Fromm, and Boudrie met to discuss these issues and Swallow's possible termination. Cascio and Fromm contacted Swallow and asked her to come out to California to meet with the three of them to hear her side of the story. They first met with Swallow on the morning of August 17, then met without her present, and finally brought the issues to the attention of the Fetzer "Leadership Committee," at a regularly scheduled monthly meeting. Cascio and Fromm presented information about Swallow to the Committee. Although it is unclear who made the ultimate decision, the result of the meeting was a decision to terminate Swallow.

On August 18, 1994, Ed Edwards was hired to replace Swallow. Fromm had interviewed him earlier in 1994, at the request of Cascio and Mary Fetzer, about possible employment somewhere in the organization. He was allowed to set up an office near his home in Cape Cod with an administrative assistant.

Swallow contended that unlike other Division Managers, she was not able to develop her own team and had to come into a position where her subordinates had previously worked directly for Cascio. While he covered the vacant Northeast Division Manager position, the Northeast team worked more independently, as he worked mainly on the West Coast. She asserted that Cascio would take the word of her subordinates over her own when a conflict arose. She said that she received very little support in developing her management skills from Cascio, in contrast to other Division Managers who were encouraged to seek his assistance, and that this contributed to her failures. She believed Cascio talked about his doubt in her ability and downplayed her professionalism to other Division Managers, which undermined her authority. What others called isolating subordinates from upper management, she characterized as trying to work out problems within the team before going to Cascio. She argued that rather than work with her in her development of relationships with distributors, Cascio continued interacting with them, thus interfering with her ability to develop those relationships.

**B. *Procedural History***

On October 20, 1994, Swallow filed a charge of gender discrimination with the United States Equal Employment Opportunity Commission (EEOC) and the Massachusetts Commission Against Discrimination (MCAD) against defendants. The MCAD investigated Swallow's charge and issued a lack of probable cause (LOPC) determination. On August 11, 1997, Swallow filed a complaint in the Massachusetts Superior Court. The case was removed to federal district court based upon diversity of citizenship.

On February 12, 1999, defendants filed a motion for summary judgment. On November 4, 1999, the court held a limited hearing on the motion so that Swallow could particularize the unlawful employment practices mentioned in her complaint and show how those practices constituted an adverse employment action within the meaning of chapter 151B. Pursuant to the court's request at the hearing, Swallow then filed an amended complaint and a

supplemental brief detailing claims of discriminatory failure to promote and other gender discrimination, in addition to her original claim of discriminatory termination. On June 4, 2001, the court granted summary judgment in favor of defendants.

## II. DISCUSSION

### A. Governing Legal Standards

This Court reviews a district court's decision to grant summary judgment de novo. *Abreu–Guzman v. Ford*, 241 F.3d 69, 73 (1st Cir.2001). Because a motion for summary judgment can only be granted when the evidence shows that there is no genuine issue of material fact and that the moving party is entitled to summary judgment as a matter of law, Fed.R.Civ.P. 56, we examine the record facts according to Swallow's version of events. *See id.;* section I(A)(1), *supra.*

We set forth the framework for discrimination claims under Mass. Gen. Laws ch. 151B, § 4, as recently refined by the Supreme Judicial Court in *Abramian v. President & Fellows of Harvard Coll.,* 432 Mass. 107, 116–18, 731 N.E.2d 1075 (2000). Where there is no direct evidence of discrimination, we follow a three-stage order of proof similar to that prescribed by the United States Supreme Court for Title VII claims. *Id.* at 116, 731 N.E.2d 1075 (citing, *inter alia, Wynn & Wynn, P.C. v. Mass. Comm'n Against Discrimination,* 431 Mass. 655, 665–66, 729 N.E.2d 1068 (2000); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

In the first stage, the employee has the burden to establish a prima facie case of discrimination by showing

(1) he is a member of a class protected by Mass. Gen. L. ch. 151B; (2) he performed his job at an acceptable level; (3) he was terminated; and (4) his employer sought to fill the plaintiff's position by hiring another individual with qualifications similar to the plaintiff's. . . . [T]he elements . . . may vary depending on the specific facts of a case.

*Id.* (quoting *Blare v. Husky Injection Molding Sys. Boston, Inc.,* 419 Mass. 437, 441, 646 N.E.2d 111 (1995)). The prima facie case creates a presumption of discrimination. *Id.*

In the second stage, the employer can rebut the presumption by articulating a lawful reason for its employment decision and adducing credible evidence to show that the stated reasons was true. *Id.* If the employer meets its burden of production at this stage, the presumption created by the prima facie case drops out and the proceedings advance to the third stage. *Id.*

Next, the employee must show that the basis of the employer's decision was unlawful discrimination. *Id.* In the summary judgment context, the employee may meet her burden either by adducing evidence of discrimination, or evidence that "the respondent's facially proper reasons given for its action against him were not the real reasons for that action." *Id.* (quoting *Wheelock Coll. v. Mass. Comm'n Against Discrimination,* 371 Mass. 130, 139, 355 N.E.2d 309 (1976)).[6]

Summary judgment is disfavored in disparate treatment cases because the "issue of discriminatory intent is a factual ques-

---

6. Under both federal and Massachusetts law, the falsity of the employer's explanation permits the jury to infer a discriminatory motive, but does not compel such a finding. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147–48, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *see also Abramian,* 432 Mass. at 118, 731 N.E.2d 1075.

tion." *Blare,* 419 Mass. at 439, 646 N.E.2d 111; *Matthews v. Ocean Spray Cranberries, Inc.,* 426 Mass. 122, 127, 686 N.E.2d 1303 (1997). It is appropriate, however, if the plaintiff is unable to present "admissible evidence of the defendant's discriminatory intent, motive, or state of mind" so as to meet his or her burden. *Id.*

A finding that the plaintiff was treated differently because of her protected class can be made even if the employer "simply did so because of unthinking stereotypes or bias." *Thomas v. Eastman Kodak Co.,* 183 F.3d 38, 58 (1st Cir.1999). Express or conscious intent to discriminate is not required. *Id.; see also Sweeney v. Bd. of Trs. of Keene State Coll.,* 604 F.2d 106, 114 (1st Cir.1979) ("One familiar aspect of sex discrimination is the practice, whether conscious or unconscious, of subjecting women to higher standards of evaluation than are applied to their male counterparts.") Evidence that other similarly situated employees were disciplined differently can be evidence of discriminatory motive. *Smith Coll. v. Mass. Comm'n Against Discrimination,* 376 Mass. 221, 227–28, 380 N.E.2d 121 (1978).

### B. *Swallow's Failure to Promote Claim*

Swallow contends that Fetzer discriminated against her when it failed to promote her to the position of Division Manager in 1991 and 1992, and when, after eventually promoting her, it delayed the award of the title of vice president for a few months. At summary judgment, the district court dismissed Swallow's failure to promote claims on several grounds: that her MCAD charge did not specify these claims with sufficient particularity; that the claims were untimely and could not be rescued by the continuing violation doctrine; and that the claims lacked substantive merit.

The first question we address is whether Swallow's MCAD charge was adequate to notice her claims of failure to promote. Under Mass. Gen. Laws ch. 151B, § 5, prior to filing a claim in state court for employment discrimination, a complainant must file an administrative charge with the MCAD. Agency regulations require the charge to contain, *inter alia:*

(a) the date(s) on which the unlawful discriminatory acts occurred; or, where the acts are of a continuing nature, the period of time during which acts occurred; [and]

(b) a concise statement of the alleged discriminatory acts[.]

804 C.M.R. 1.10(5) (1998).

"The purpose of this requirement is twofold: (1) to provide the MCAD with an opportunity to investigate and conciliate the claim of discrimination; and (2) to provide notice to the defendant of potential liability." *Cuddyer v. Stop & Shop Supermarket Co.,* 434 Mass. 521, 531, 750 N.E.2d 928 (2001). "That purpose would be frustrated if the employee were permitted to allege one thing in the administrative charge and later allege something entirely different in a subsequent civil action." *Lattimore v. Polaroid Corp.,* 99 F.3d 456, 464 (1st Cir.1996) (interpreting Title VII). Accordingly, failure to set forth a discrimination claim at the agency level generally warrants dismissal. *Cuddyer,* 434 Mass. at 531 n. 11, 750 N.E.2d 928.

Still, we have noted that the MCAD charge is "not a blueprint for the litigation to follow." *Powers v. Grinnell Corp.,* 915 F.2d 34, 38 (1st Cir.1990). Even where a claim was not explicitly included in an agency charge, the claim may survive if it was within the "scope of the investigation," i.e., was based on acts of discrimination that the MCAD investigation "could rea-

sonably be expected to uncover."[7] *Davis v. Lucent Tech., Inc.,* 251 F.3d 227, 233 (1st Cir.2001). Though an investigation's failure to extend to a claim in question can "buttress[ ]" a court's outside-the-scope finding, *Lattimore,* 99 F.3d at 465, a claim that should have been investigated can still be deemed within the scope "regardless of whether it was actually investigated." *Davis,* 251 F.3d at 233.[8]

For a claim to fall within the scope of the investigation, the plaintiff must "describe the essential nature of the claim and ... identify the core facts on which it rests." *Lattimore,* 99 F.3d at 464. The intent of the plaintiff at the time of filing of the administrative complaint can be instructive in determining if a particular claim falls within the scope of the investigation. *See id.* (noting a harassment claim was not mentioned in the administrative charge and was not raised until an amendment to plaintiff's district court complaint was filed ten months after the filing of the district court complaint).

Swallow's MCAD complaint stated:

I believe I have been a victim of sex discrimination in my employment in violation of M.G.L. c. 151B and Title VII.[9] I believe that the individual named in this Complaint aided and abetted in the discriminatory acts. On or about August 17, 1994, I was unlawfully terminated from Fetzer Vineyards. In further support, I attach and incorporate my Affidavit as to the particulars of this charge.

In her attached affidavit, Swallow primarily discussed her termination. She also made three statements related to Fetzer's failure to promote women: 1) that "Fetzer and Mr. Cascio in particular, demonstrated a pattern and practice of failing to promote women at the higher levels of management"; 2) that other professionals at Fetzer "observe[d] that women have noticeably been excluded from meaningful promotion and positions of senior management"; and 3) that "Mr. Cascio refused to designate me a 'Vice President' as part of that promotion (like *all* other Division Managers, who are male) until many months after my promotion, and only when it became embarrassingly obvious that I was being treated differently than my male counterparts."

Swallow filed with the MCAD a rebuttal to Fetzer's response to her charge. In the rebuttal, her discussion of the discrimination she suffered does not include defendant's failure to promote her. She stated: "Complainant's initial charge alleges that the Respondents discriminated against her based upon her sex (female) in discharging her from her position." Swallow's appeal of the MCAD's LOPC finding was similarly restricted to her termination.

Taking into consideration all of this evidence, we conclude that Swallow did not intend to assert a separate failure to promote claim at the time she filed her administrative charge. She set forth neither the essence of an individual failure to promote claim nor the specific facts of the 1991 and 1992 promotion incidents. *See Lattimore,*

7. In *Clockedile v. N.H. Dep't of Corrections,* 245 F.3d 1, 6 (1st Cir.2001), we partially abrogated the scope of the investigation rule as to certain cases involving retaliation claims. *Clockedile* is not directly relevant to Swallow's case, however, as she does not assert a retaliation claim.

8. Given the dearth of Massachusetts appellate law construing the scope of the investigation

test, we look to federal law. *See Wheatley v. Am. Tel. & Telegraph Co.,* 418 Mass. 394, 397, 636 N.E.2d 265 (1994) ("It is our practice to apply Federal case law construing the Federal anti-discrimination statutes in interpreting G.L. c. 151B.").

9. Swallow later dropped the federal claim and sought redress only under chapter 151B.

99 F.3d at 464. Although Swallow referred to a "pattern and practice of failing to promote women at the higher levels of management" in her affidavit, she does not mention any specific instances in which *she* was denied a promotion.[10] Moreover, her agency rebuttal discussed the failure to promote and disparate treatment of women within Fetzer only to provide "some background understanding of her position within the Company." Accordingly, we conclude that the district court was correct in holding that Swallow did not adequately set forth her failure to promote claim in her MCAD charge, and hence failed to exhaust her administrative remedies.

■ Swallow's claim based on undue delay in giving the Vice President title, however, was set forth with more specificity, including naming the responsible actor. Even though she did not expressly set forth the title delay as a claim distinct from her termination, it was at least specific to her treatment, not a generalization about women at Fetzer. Thus, we cannot conclude that this allegation, too, fell beyond the scope of the investigation.

■ Although dismissal of the title delay claim on administrative exhaustion grounds was error, we affirm the dismissal of the claim on the merits.[11] The record does not support the conclusion that the

short delay in receiving the Vice President title constituted an adverse employment action within the meaning of chapter 151B. Swallow offers no evidence indicating that the delay affected her wages, bonuses, benefits, or ability to perform her duties. *See Randlett v. Shalala,* 118 F.3d 857, 862 (1st Cir.1997). For this additional reason, then, her chapter 151B claim cannot proceed on the basis of the delay in title.

■ Even assuming that Swallow could make out a prima facie case of gender discrimination in delaying her title, she has not adduced sufficient evidence in the third stage of the summary judgment framework. Here, Fetzer has shifted the burden of production back to Swallow by articulating a lawful reason for its employment decision and adducing credible evidence to show that the stated reason was true: namely, that Fetzer deferred conferring titles during a restructuring period so as to avoid disparity of titles between Fetzer employees and Brown–Forman employees. *See Abramian,* 432 Mass. at 117, 731 N.E.2d 1075. Fetzer adduced evidence that two male Division Managers were similarly delayed in receiving the Vice President title after assuming their positions. Against this, Swallow has not presented any evidence indicating that the basis of Fetzer's decision was unlawful gender discrimination.[12] *See id.* For

10. In her affidavit, Swallow also states, "My promotion to the position of Northeast Division Manager required me to so 'overachieve' in my performance as to have made my lack of promotion to that position obviously discriminatory." This sentence cannot fairly be understood to be complaining of a failure to promote, since Swallow states that she in fact received the promotion; the reference to "lack of promotion" seems, in this context, to be hypothetical.

11. The district court dismissed the title delay claim on the additional ground that it was untimely. Because we affirm on the merits, there is no reason for us to consider whether

that claim was part of a continuing violation such that it was rescued from the statute of limitations.

12. Swallow states that at the time she was given the promotion, Cascio told her they would have to wait and "see how it goes" before giving her the title. It is true that in some cases, evidence that a defendant's reason was pretextual may, coupled with a plaintiff's prima facie evidence, permit an inference of discrimination, thereby precluding summary judgment. *Abramian,* 432 Mass. at 118, 731 N.E.2d 1075. In this case, however, the statement "see how it goes" does not necessarily contradict defendants' stated rea-

these reasons, Swallow's failure to promote claims should not be presented to a jury.

## C. *Other Miscellaneous Discrimination*

The allegations of discrimination set forth in Swallow's amended complaint, filed after Fetzer moved for summary judgment, are much more extensive and numerous than those described in her earlier filings. In addition to the termination and promotion claims, she set forth the following as separate independent acts of discrimination: four instances of stripping of supervisory authority [13]; rendering discipline unequally; slights, indignities, and professional ostracism [14]; gender stereotyping in evaluation; unwarranted negative performance review; stripping her of a work-related privilege by failing to assist her in managing her subordinates; and divesting her of responsibilities by not allowing her to develop her own team. [15]

■ Of these claims, only the gender stereotyping in evaluation was referenced specifically in Swallow's MCAD complaint. The others appear to be related to her termination claim, but nowhere in the agency charge did she indicate that they should be treated as separate and independent claims of discrimination. For the reasons discussed in section II(B), *supra,* we hold that Swallow failed to exhaust her administrative remedies with regard to these miscellaneous claims of discrimination (save only the gender stereotyping in

evaluation claim). This evidence may be considered in evaluating her termination claim, *infra,* however. *Cf. Sabree v. United Bhd. of Carpenters and Joiners, Local No. 33,* 921 F.2d 396, 400 n. 9 (1st Cir. 1990) (plaintiff may use events occurring outside limitations period to establish discrimination, even if she may not recover damages thereupon); *Cuddyer,* 434 Mass. at 542, 750 N.E.2d 928.

■ Insofar as Swallow seeks to assert gender stereotyping in evaluation as a separate discrimination claim, we affirm the district court's dismissal on the merits. Apart from her termination, addressed *infra,* she has presented no evidence that any adverse action resulted from the alleged stereotyping. *See Randlett,* 118 F.3d at 862.

## D. *Swallow's Termination Claim*

■ Next we assess Swallow's claim that her termination from Fetzer was based on unlawful gender discrimination. Here, we assume without deciding that Swallow established her prima facie case of discriminatory termination. Defendants rebutted this by asserting that they terminated Swallow's employment because she treated her staff and customers inappropriately. To survive summary judgment, Swallow must now adduce sufficient evidence of disparate treatment for a jury to believe that defendants' reasons are pre-

sons for the delay, and the entirety of the evidence does not, as a matter of law, support an inference of gender discrimination.

**13.** The instances of stripping of supervisory authority she alleged were: "allow[ing] Ascoli[, a subordinate,] to dictate the management of the division; ... openly questioning and thereby hampering her ability to manager [sic] her division; ... encouraging her subordinates to 'mutiny'; ... [and] reducing her responsibilities by discounting her contribution to the management of her division."

**14.** Swallow alleges that Cascio referred to her as "Jan the Man."

**15.** In her brief before this Court, Swallow additionally asserts that defendants refused to allow her to relocate her office in contrast to other Division Managers. As this argument is presented for the first time on appeal, we do not consider it. *See, e.g., United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.1990).

texts for discrimination. In support of this claim, she points to the evidence discussed *supra*, as well as affidavits submitted by other Fetzer employees concerning her treatment.

To show that two individuals are similarly situated for purposes of showing disparate treatment, a plaintiff must "identify and relate specific instances where persons similarly situated in all relevant aspects were treated differently." *Matthews*, 426 Mass. at 129, 686 N.E.2d 1303 (internal quotations omitted) (adopting same approach as the federal courts use for Title VII claims). The alleged offenses do not need to be identical, but "must be of comparable seriousness." *Id.* at 130, 686 N.E.2d 1303.

Under this rule, Swallow must show that "she was similarly situated to [other Vice President Division Managers] in terms of performance, qualifications and conduct, without such differentiating or mitigating circumstances that would distinguish their situations." *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 17 (1st Cir.1994) (internal quotations omitted) (applying federal law). "The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." *Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 20 (1st Cir.1999) (quoting *Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13, 19 (1st Cir.1989)).

Swallow contends that several male Division Managers at Fetzer were not fired despite complaints asserted against them, in contrast to her treatment. She first points to Ed McLaughlin, who briefly held the Northeast Division Manager position before Swallow was promoted. Dodd, a District Sales Manager who worked under McLaughlin and later Swallow, complained to Cascio about the way McLaughlin was managing the division, and stated that

McLaughlin was alienating distributors. Cascio described McLaughlin's performance as "pushing the envelope and wanting more out of it" and referred to a "style and . . . delivery" issue:

> He had some communication issues with his direct reports. He had a different style that people might have needed to get used to. And, I did hear some feedback that the style in his delivery was something that was a little rough, but that is about as far as it goes. . . . I don't think he would be really considered aggressive in management style. He was just very demanding.

Although the complaints about McLaughlin are comparable in nature to some of those against Swallow—i.e., complaints concerning his management style and relationships with distributors—they differ significantly in scope and quantity. Cascio only received one specific complaint over the duration of McLaughlin's employment. Swallow, in contrast, was the subject of numerous complaints by her subordinates, buyers, and distributors; the severity of her relational problems with her subordinates resulted in more than one employee quitting. Hence, without more, McLaughlin's situation cannot reasonably be deemed similar in all relevant aspects to Swallow's so as to establish disparate treatment. *See Matthews*, 426 Mass. at 129, 686 N.E.2d 1303.

Next, Swallow attempts to compare her treatment with that of Jack Tanksley, another Division Manager at Fetzer. In 1994, Tanksley was accused of sexually harassing an employee: he pointed out and talked about an employee's breasts at a business dinner and later asked her to lift up her shirt so he could take a picture of her and have it made into a keychain. After an internal investigation, the Fetzer Leadership Committee determined that no sexual harassment had occurred but that

Tanksley had engaged in inappropriate behavior. A note to that effect was placed in his personnel file, stating "that any further complaints will also be thoroughly investigated, and may be grounds for termination." Swallow additionally alleged that he made racist and sexist jokes and generally behaved unprofessionally. After these incidents, Tanksley was not demoted or otherwise disciplined, other than the placement of the letter of reprimand in his personnel file. He was eventually terminated for falsifying business expenses.

Swallow contends that Tanksley was retained by Fetzer even given his "outrageous personality" because he was always "making the numbers." While Tanksley's alleged actions are certainly deplorable, Swallow has not shown that Tanksley's problems in the office were sufficiently similar to hers. *See Conward*, 171 F.3d at 20–21 (incidents of shoving a student without pre-meditation, striking a student, and alleged but denied acts of inappropriate sexual contact by a coach were not sufficiently similar to passing a sexually harassing note to a student that led to plaintiff teacher's termination). We cannot reasonably compare Swallow's situation—in which several employees were threatening to resign due to her demeaning treatment of them, retailers and distributors were threatening to pull business, and she had revealed confidential business information—to Tanksley's inappropriate and obnoxious behavior.

Swallow also points to Chip Mercer, another Fetzer Division Manager and later Area Manager, as an appropriate comparator. Swallow submitted an affidavit from Mercer, as well as several of his performance reviews, to show that although Mercer had conflicts with subordinates, he, unlike Swallow, was allowed to develop his own team and received support from his supervisors. One evaluation states:

With the personnel changes and problems this last year Chip has had to adjust to new ways of doing things. Now that his territory has been redefined he must communicate with his subordinates to insure nothing falls through the cracks. I'm looking forward to a more active, seeking out type of teamwork from someone who has a lot he can teach others.

Another evaluation said, "Chip faced some extreme management challenges with his team. With personnel changes, I am now confident that Chip can build a solid team." In his deposition, Andrew Fromm, Mercer's supervisor during his time as Division Manager, recalled generally that an employee was concerned about the way in which Mercer approached his business from an organizational perspective. Again, however, the record does not indicate the complaints against Mercer were as numerous or severe as those against Swallow, rendering the comparison ineffective to prove disparate treatment.

Further, the documented problems concerning Swallow's male colleagues all concerned problems with their interactions with other Fetzer employees. The problems with Swallow's performance extended beyond simply internal co-worker relations, affecting customer relations. For a position in sales, this is a highly material distinction.

Finally, Swallow points to affidavits submitted by Mercer and another Division Manager at Fetzer, Alan Portnoy. Mercer alleged in his affidavit that Cascio was unsupportive of Swallow, held her to a higher standard of conduct and performance than the male Division Managers, and undermined her within the company. For example, Cascio regularly called Mercer to offer assistance, but did not do the

same for Swallow.[16] Mercer also stated that others were promoted despite problems with their management style, and that he perceived that sales figures were "the only important performance criteria" for promotion and bonuses for male employees.

In his affidavit, Portnoy stated that Swallow received little support and was treated differently from the male managers. Moreover, Portnoy alleged, "no other Division Manager would have been terminated" for the reasons Swallow was fired.

On April 1, 1999, defendants filed a motion to strike these affidavits. They challenged the affidavits' admissibility on the grounds that they relied on hearsay, were not grounded in personal knowledge, and violated an agreement not to engage in *ex parte* communication with former managerial employees of Fetzer. Apparently without deciding the motion to strike, the magistrate judge issued his summary judgment decision. The opinion does not mention the affidavits.

Even if the affidavits were considered, the admissible portions of them do not enable Swallow to show that defendants' reason for her termination was a pretext, or that she was treated differently from male comparators in the discipline she received. As set forth *supra*, none of the three men to whom Swallow points are valid comparators, and nothing is added to her case by reference to unidentified males. The other statements in the affidavits are simply not material to the reason for her termination or the discipline imposed.

*Affirmed.*

---

**16.** Defendants respond that this was during a time when Cascio was Mercer's direct supervisor.