**Debra LUCIANO**

v.

**COCA–COLA ENTERPRISES, INC.,
Walter Gordon, Douglas Smith,
and Joseph Papapietro**

**No. CIV.A. 02–CV–10895RG.**

United States District Court,
D. Massachusetts.

March 10, 2004.

Floyd H. Anderson, Law Offices of Floyd H. Anderson, P.C., Boston, MA, for Plaintiff.

John R. Bode, Miller & Martin, Chattanooga, TN, Joseph Y. McCoin, III, Miller & Martin LLP, Chatanooga, TN, Michael L. Rosen, Foley Hoag LLP, Boston, MA, for Defendants.

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

STEARNS, District Judge.

Plaintiff Debra Luciano brought this gender discrimination complaint under 42 U.S.C. § 2000e, and its Massachusetts homologue, G.L. c. 151B, against her former employer, Coca–Cola Enterprises, Inc. (Coca–Cola), and two of her former supervisors, Walter Gordon and Joseph Papapietro, as well as Douglas Smith, a Coca–Cola Director of Human Resources. Luciano alleges that Coca–Cola's "anti-woman culture" led to her constructive discharge from a managerial position at Coca–Cola New England (Coca–Cola NE).[1] Defendants now move for summary judgment, arguing that Luciano has failed to produce

---

1. In Counts I and II of the Complaint, Luciano alleges gender discrimination on the part of Coca–Cola in violation of Title VII of the Civil Rights Act of 1964, and G.L. c. 151B. In Counts III, IV, and V, Luciano alleges that Coca–Cola NE Vice President of Sales Walter Gordon, Director of Human Resources Douglas Smith, and Vice President/General Manager Joseph Papapietro, aided and abetted gender discrimination in violation of G.L. c. 151B. Finally, in Counts VI, VII, and VIII of the Complaint, Luciano alleges that Gordon, Smith, and Papapietro tortiously interfered with her employment relationship with Coca–Cola.

evidence of either an adverse employment action or discriminatory animus.

## BACKGROUND

The facts in the light most favorable to Luciano are as follows. Luciano worked for Coca–Cola NE from 1997 until 2001. During the latter part of Luciano's tenure with Coca–Cola NE, Douglas Smith was the Director of Human Resources. In March of 2000, Walter Gordon was named Coca–Cola NE's Vice President of Sales and as a result became Luciano's immediate supervisor. In December of 2000, Joseph Papapietro became Vice President/General Manager and the head of Coca–Cola NE.

Coca–Cola NE hired Luciano in 1997 as a Category 2 Key Account Manager[2] at its home office in Needham, Massachusetts.[3] Luciano's principal task was to call upon corporate headquarters in the surrounding sales territory to promote the placement of Coca–Cola products. Luciano reported to the Director of Key Accounts, Nick Massey, who in turn reported to the Vice President of Sales, Paul LeBlanc.[4]

In April of 1998, Luciano was promoted to the newly created position of Director of Key Accounts for Category 2. Prior to Luciano's promotion, the Category 1 and Category 2 accounts had been overseen by Massey, who replaced LeBlanc as Vice President of Sales. Steven Paccone became Luciano's counterpart as Director of Key Accounts for Category 1. Luciano still reported directly to Massey.

Luciano found Massey (who is not named as a defendant) to be a difficult supervisor "because of his practice of subjecting female employees to public ridicule and hostility, not only in front of their own peers and superiors, but also in front of their customers." Plaintiff's Brief, at 4. Luciano felt that Massey's requests that she "type up" reports and his frequent interruptions of female presenters at monthly sales meetings were demeaning.

A: It was verbal harassment, and it was hard to tell you the exact words that he used. But it would be ... like "That's ludicrous," or "That just doesn't make sense," and kind of downgrading...

Q: Are you testifying that he didn't attack males or any man's presentation?

A: He tended to do those when he was with them one-on-one, not in the group setting. He tended to do the verbal attacking when we were in a group on individuals such as Kristen Francour and folks like that.

Q: I'm confused. When he was with someone else one-on-one, you're not in there, right?

A: Right. Yes.

Q: Is that when he would attack these plans?

A: No. See, you asked if he did it beyond the women, if the men also felt this attack.

Q: Right.

A: They did not feel it to the extent that we felt it in the female side, because ours was more on a—we got it when it was in public.

Q: So you know that he attacked men too; he just didn't do it in public?

---

2. Category 2 accounts included convenience stores and gas station mini-marts. Category 1 accounts included supermarkets, mass merchandisers, and wholesale buying "clubs," such as Costco.

3. Coca–Cola NE is one of twenty-four national divisions of Coca Cola Enterprises, Inc.

4. As will become apparent, during the four years of Luciano's employment, Coca–Cola NE resembled the French Third Republic with its dizzying management reshuffles and constantly shifting cast of characters.

A: I know of some instances, yes.

In early 1999, Luciano learned that Coca–Cola NE was creating a new position of Director of Marketing. Luciano lobbied Massey and Phillip Emma, the recently appointed Coca–Cola NE Vice President/General Manager for the job. Emma told Luciano that the position was not "right for her." The job was never posted, and in February of 1999, Paccone, who in Luciano's judgment had less marketing experience than she did,[5] was named Director of Marketing. Luciano retained the Category 2 accounts and also assumed responsibility for all of the Category 1 accounts with the exception of Shaw's Markets and Stop and Shop, which were assigned to Andrew Marchessault and Thomas Noyce.

In April of 2000, Massey was transferred to the Atlanta headquarters of Coca–Cola and Walter Gordon became the Vice President of Sales.[6] Luciano, Marchessault, and Noyce now reported directly to Gordon. Each in turn directly supervised a category manager and a marketing analyst who were responsible for amassing and analyzing external and internal sales data. Marchessault and Noyce (but not Luciano) were given the title of Market Development Manager and a raise in pay.[7] Convinced that her prospects for promotion at Coca–Cola NE were negligible, Luciano began to search for new employment. She interviewed for a position at Coca–Cola in Atlanta, and received an offer, but her transfer required Emma's approval. Emma refused the transfer request. In the summer of 2000, Gordon created another new position, Director of Category Managers, a job that went to Robert Hall, then the Director of Cold Drinks.

Luciano was not invited to certain Coca–Cola business and social events, which were often centered on "traditional male activities, such as golf." Complaint ¶ 18. In August of 2000, Coca–Cola NE held a business meeting in Providence, Rhode Island, featuring a "team-building" game of paintball. Luciano told Emma that she was uncomfortable with the exercise and refused to participate.[8] In the same month, Emma convened a financial planning meeting on Martha's Vineyard to which Luciano was not invited.[9] In January of 2001, Luciano was not invited to a social event held in Miami by Coca–Cola NE and Coca–Cola of New York for selected sales personnel. The event featured attendance at the Superbowl and a golfing weekend at the Doral Resort. Luciano also was not included in a Red Sox opening day event at Fenway Park arranged by Marchessault for Shaw's Market executives.[10] On May 14, 2001, Luci-

---

5. Prior to coming to Coca–Cola NE, Luciano had worked for fifteen years as a Procter & Gamble sales representative.

6. Paccone left Coca–Cola NE for the Atlanta office at roughly the same time.

7. As defined, the Market Development Manager was a Key Account Manager with supervisory responsibilities. Luciano, who was not given this more imposing title, would appear to have met the definition.

8. Luciano acknowledged that some female employees did participate, while she and others, including some male employees, went shopping instead. Luciano Dep. Vol. 2, at 19–20. Luciano does not allege that she was disciplined for refusing to take part in the paintball game.

9. Coca–Cola maintains that Luciano was not invited to the Martha's Vineyard meeting because she did not report directly to Emma. Luciano notes that the new Director of Human Resources, Barbara Bowman, who also did not report to Emma, was invited to the meeting.

10. In addition to Marchessault, the Coca–Cola executives who attended the Shaw's Market opening day event were Gordon, Brendan Brazel (Vice President of Opera-

ano was not invited to a "Connecting with Customers" training seminar.[11]

*Luciano's Claims against the Individual Defendants*

Gordon held regular meetings with Luciano, David Eberhart (the new Director of Cold Drinks), Hall, Marchessault, and Noyce. Concerned that her twenty two accounts were being slighted in sales meetings (in contrast with Marchessault's and Noyce's single accounts), Luciano requested additional time without Marchessault and Noyce being present to discuss sales strategy with Gordon. Gordon "either ignored or rebuffed her requests." Plaintiff's Brief, at 11.

In September of each year, the Coca–Cola NE Directors of Key Accounts presented "channel plans" to the national Coca–Cola sales managers. With the help of her Key Account Managers, Luciano would gather sales data from the prior year to provide a basis for forecasting sales for the coming year. In 1997, 1998 and 1999, Luciano gave "channel plans" presentations to the Coca–Cola top brass. In 2000, Gordon assigned Marchessault and Donald Barsalou (yet another Market Development Manager), to present Luciano's "channel plan." Gordon told Luciano that he wanted to give the two men more

exposure to Coca–Cola's senior management.

According to Luciano, Gordon continually undermined her authority with her account managers by overriding her decisions regarding pricing and the advertising budget, while holding her to unrealistic sales goals. He also required her to perform tasks that she deemed inappropriately "secretarial."[12] Luciano's subordinates, sensing her disfavor, began to go directly to Gordon, Marchessault, and Mike Defer, an Area Vice President, seeking to circumvent her instructions. Gordon became increasingly critical of Luciano's management style and communication skills. In January of 2001, Gordon told Luciano that Gary Dumas had complained that Luciano was failing to give clear directions to his Sales Center staff.[13] Luciano was surprised and asked for a meeting with Dumas' group. With Gordon present, the Sales Center staff was in "universal agreement" that "the Needham office and the [S]ales [C]enter were communicating and functioning extremely effectively together." Plaintiff's Brief, at 16.

According to Luciano, Marchessault (who is not a defendant) verbally harassed her and her staff,[14] and ignored her requests for the information she needed to complete the key accounts reports. When

tions), and Gary Dumas (a Sales Center Manager). Coca–Cola contends that Luciano was not invited to the event because she was not responsible for the Shaw's account. Luciano admits that she was permitted to use the Coca–Cola NE skybox to entertain her own clients at Red Sox games on other occasions.

11. Gordon told Luciano that she was scheduled to attend a similar training session that was to take place in Atlanta. Luciano resigned from Coca–Cola before that session took place.

12. At her deposition, Luciano conceded that Gordon had made similar demands of his male subordinates.

13. The Sales Centers were the units responsible for the provisioning of direct stores with Coca–Cola products.

14. On September 15, 2000, Luciano called Marchessault to complain after one of her Key Account Managers, on Marchessault's instructions, had changed a forecast that Luciano had prepared for the "club channel." Marchessault was verbally abusive in response. In February of 2001, Luciano witnessed Marchessault "inappropriately berate" one of her clerical assistants.

Luciano asked Gordon to intervene, he replied that she "should work it out with Marchessault herself."

In March of 2001, Gordon gave Luciano a "decidedly negative" performance appraisal.[15] He recommended no salary increase and the implementation of a ninety-day Performance Improvement Plan.[16] After an unpleasant meeting with Gordon on April 16, 2001, Luciano appealed to Smith, Barbara Bowman's successor as Director of Human Resources.[17] The three met the following day to discuss Gordon's negative appraisal. Luciano challenged each of Gordon's Below Target ratings. She presented Gordon and Smith with a four-inch binder of materials cataloguing her disagreements with Gordon's negative assessment. At Luciano's request,[18] Smith agreed to initiate a "360 review" of her performance.[19] After examining Luciano's materials and discussing the matter with Smith, Gordon changed his rating of her performance in the area of Teamwork from Below Target to On Target. He declined, however, to make any other changes to the evaluation.

On April 17, 2001, all of the marketing analysts, including Luciano's assistant, Monica Moore, were placed under Hall, the Director of Category Managers. In addition, two of Luciano's Key Account Managers, Linda Reece and Joseph Flaherty, were "shifted" to Marchessault. No replacement was named for Moore, upon whose assistance Luciano depended in compiling the weekly sales reports. The day following Moore's reassignment, Gordon e-mailed Luciano to remind her that "you still own the report" and that "[t]here will be zero tolerance for this report not being completed on a weekly basis in a timely and accurate manner since our [senior managers] use the tool for forecasting."

Luciano and Gordon met on May 7, 2001, to discuss her performance appraisal further. Smith did not attend, despite a request by Luciano that he do so. At the meeting, Gordon presented Luciano with the ninety-day Performance Improvement Plan.[20] Gordon identified leadership, communication, and volume/gross profit as areas in which Luciano needed to improve. Gordon agreed to meet with Luciano on a weekly basis to discuss her progress.

At a leadership forum for Coca-Cola female executives in early May, Luciano became acquainted with Mary Knight-Cherry, a Vice-President in Coca-Cola Atlanta's Human Resources Department. After receiving the Performance Improvement Plan from Gordon, Luciano called Knight-Cherry to complain about "discrimination and harassment." On May 10, 2001, Knight-Cherry told Luciano that she had relayed the complaint to Gordon's supervisor, Joseph Papapietro, the Vice President/General Manager of Coca-Cola

---

**15.** The timing of the review was not significant. Coca-Cola required that performance reviews of its managers be conducted each spring.

**16.** According to Luciano, she was then on the verge of successfully negotiating a deal with K-Mart and the Boston Red Sox for an advertising campaign that would involve all seventy-two K-Mart stores in New England.

**17.** Bowman, who had earlier been fired, also filed a discrimination complaint against Coca-Cola.

**18.** Coca-Cola maintains that the suggestion came from Gordon.

**19.** A "360 review" is a structured process in which an employee's supervisors and direct subordinates complete a questionnaire designed to provide Coca-Cola with an overall picture of the employee's strengths and weaknesses. Coca-Cola concedes that Smith, who was new to the process, was slow in getting the review off the ground.

**20.** A ninety-day Performance Improvement Plan is required by Coca-Cola NE for any employee who receives a Below Target rating.

NE. She suggested that Luciano contact Papapietro directly. At Luciano's request, Papapietro agreed to hear her complaints about Gordon. At the end of the meeting, Papapietro agreed to meet with Luciano's subordinates.

Papapietro did so on May 21, 2001, without Gordon or Luciano being present. The group discussed the performance of the Key Accounts Group. The employees complained to Papapietro about a lack of communication and direction. After the meeting, Papapietro was approached by Key Account Manager Joseph Flaherty.[21] Flaherty told Papapietro that he had learned more in four weeks working for Marchessault than he had in a year working for Luciano. Papapietro left the meeting convinced that there were supervision problems in the Key Accounts Group, for which he blamed both Gordon and Luciano.

Later that day, Papapietro met with Gordon and Luciano and informed them of his conclusions and his expectation that they would mutually resolve the problems that he had identified. Luciano told Papapietro that there were no problems for which she was responsible, and that in light of Papapietro's failure to address her complaints about the "insurmountable good old boy network" at Coca–Cola, she was resigning. Luciano handed Papapietro a typed letter of resignation. After Luciano left Coca–Cola NE, her job responsibilities were divided among Marchessault, Barsalou, and a third male manager.[22]

On June 4, 2001, Luciano filed a dual charge with the Massachusetts Commission Against Discrimination (MCAD) and the Equal Employment Opportunity Commission (EEOC). The Complaint was filed in the federal district court on May 16, 2002, after the EEOC issued a Right to Sue letter.

At the time Luciano resigned from Coca–Cola on May 21, 2001, she was the highest ranking and highest paid female executive in the sales division of Coca–Cola NE. Throughout her tenure with Coca–Cola, the eleven Sales Center Managers, who occupied comparable positions, were male, as were thirty-three of the thirty-four district managers (the level directly below Sales Center Managers). According to Luciano's calculations, the ratio of men to women managers at Coca–Cola NE in 1999 was 4.3 to 1, in 2000, 3.9 to 1, and in 2001, 4.3 to 1. During her last year at Coca–Cola, Luciano earned approximately $97,000, while she estimates that her male counterparts were paid an average of $107,000.

## DISCUSSION

■ Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In employment discrimination cases "where elusive concepts such as motive or intent are at issue," summary judgment is not a favored tool, but judgment will enter if the non-moving party "rests [her case] merely upon conclusory allegations, improbable inferences,

---

21. Approximately one month before the meeting, Flaherty had begun reporting directly to Marchessault.

22. On these facts, construed in the light most favorable to Luciano, it is somewhat surprising that Smith and Papapietro are named as defendants. Luciano does not appear to claim that they engaged in any acts of discrimination. The most that can be gleaned from the materials submitted by Luciano is that she was disappointed that Smith and Papapietro did not more energetically come to her defense.

and unsupported speculation." *Feliciano de la Cruz v. El Conquistador Resort and Country Club,* 218 F.3d 1, 5 (1st Cir.2000). "Even in discriminatory discharge cases, where the plaintiff can rarely present direct, subjective evidence of an employer's actual motive, the plaintiff cannot survive summary judgment with 'unsupported allegations and speculations,' but rather must 'point to specific facts detailed in affidavits and depositions—that is, names, dates, incidents, and supporting testimony—giving rise to an inference of discriminatory animus.'" *Hoeppner v. Crotched Mountain Rehabilitation Center, Inc.,* 31 F.3d 9, 14 (1st Cir.1994).

*Statute of Limitations*

An employment discrimination charge must ordinarily be filed with the EEOC or the MCAD within 180 days of an act alleged to have been discriminatory. 42 U.S.C. § 2000e–5(e)(1); G.L. 151B, § 5. However, where as here, a plaintiff files her initial charge with the MCAD, the EEOC deadline is enlarged to 300 days. The deadlines must be strictly observed. Under federal law, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act." *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).[23] The rule is different, however, where the claim is one of hostile environment.

> Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. *See* 1 B. Lindemann & P. Grossman, *Employment Discrimination Law* 348–349 (3d

ed.1996) (hereinafter Lindemann) ("The repeated nature of the harassment or its intensity constitutes evidence that management knew or should have known of its existence"). The "unlawful employment practice" therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. *See Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) ("As we pointed out in *Meritor [Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986),]* 'mere utterance of an … epithet which engenders offensive feelings in a[n] employee,' *ibid.* (internal quotation marks omitted), does not sufficiently affect the conditions of employment to implicate Title VII"). Such claims are based on the cumulative effect of individual acts.

*Id.* at 115, 122 S.Ct. 2061. Because "the entire hostile work environment encompasses a single unlawful employment practice … [i]n order for the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment." *Id.* at 117–118, 122 S.Ct. 2061. Massachusetts law on this point prefigured the holding in *Morgan.*

> To establish a timely hostile work environment claim of sex discrimination under G.L. c. 151B, a plaintiff must establish that she (in a sexual harassment case the plaintiff is usually a she) was compelled to work in such an environment during her employment. Further, she must show, within the six-month limitation period, the existence of at

---

**23.** "Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse

employment decision constitutes a separate actionable 'unlawful employment practice.'" *Id.* at 114, 122 S.Ct. 2061.

least one incident of sexual conduct which, standing alone might not necessarily support her claim, but which substantially relates to earlier incidents of abuse, and substantially contributes to the continuation of a hostile work environment, such that the incident anchors all related incidents, thereby making the entirety of the claim for discriminatory conduct timely.

*Cuddyer v. Stop & Shop Supermarket Co.,* 434 Mass. 521, 533, 750 N.E.2d 928 (2001).

■ While a timely-filed charge will not resurrect a cause of action based on an untimely charge, under both federal and state law time-barred acts may be used as background evidence to support timely-filed claims. *Morgan,* 536 U.S. at 112, 122 S.Ct. 2061; *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977); *Cuddyer,* 434 Mass. at 541, 750 N.E.2d 928. Moreover, if an act contributing to a hostile environment claim occurs within the limitations period, "the entire time period of the hostile environment may be considered by the court for the purposes of determining liability."

*Morgan,* 536 U.S. at 117, 122 S.Ct. 2061. *See also Crowley v. L.L. Bean, Inc.,* 303 F.3d 387, 395–396 (1st Cir.2002).

■ Luciano, unfortunately, limits her entire discussion of the statute of limitations to a single footnote in her brief.[24] Luciano's Complaint, amplified by her brief, identifies three discrete adverse acts that might be perceived as "independently" discriminatory: (1) the refusal of Massey and Emma in February of 1999 to consider her for the position of Director of Marketing; (2) Gordon's failure to elevate her with her male congeners in April of 2000 to the position of Market Development Manager;[25] and (3) her May 21, 2001 resignation, which Luciano characterizes as a constructive discharge.[26] While under the *Morgan* rule only the last of these discrete acts might be independently actionable, the Complaint perhaps could be read to simply register these events as manifestations of a masculine management culture that refused to tolerate a strong female presence in its ranks. If interpreted to allege a hostile environment claim, the Complaint would survive a statute of limitations challenge under both state and federal law.[27]

24. In the footnote, Luciano argues that her c. 151B claims are preserved by the so-called "continuing violation doctrine." *See Cuddyer,* 434 Mass. at 531–532, 750 N.E.2d 928. This is doubtful for two reasons. First, because (as will be demonstrated) no constructive discharge occurred on May 21, 2001, there is no "discrete violation within the six-month limitations period to anchor the earlier claims." *Id.* at 532, 750 N.E.2d 928. Second, while the Supreme Judicial Court has yet to address *Morgan,* the Massachusetts Appeals Court has intimated that *Morgan* accurately reflects Massachusetts law. *See Morrison v. Northern Essex Community College,* 56 Mass.App.Ct. 784, 793, 780 N.E.2d 132 (2002).

25. Luciano alludes also to the appointment of Hall in the summer of 2000 to the position of Director of Category Managers, but does not claim that she was a candidate for the position.

26. It would appear from the charge presented to the MCAD that Luciano included Gordon's negative performance evaluation in this list. However, an unfavorable job rating that results in no material change in an employee's conditions of employment does not rise to the level of an actionable adverse employment action. *Gu v. Boston Police Dep't.,* 312 F.3d 6, 14 (1st Cir.2002); *Blackie v. Maine,* 75 F.3d 716, 725 (1st Cir.1996). The only tangible impact of Gordon's negative appraisal was the imposition of the ninety-day Performance Improvement Plan and the intended "360 review." Whether either of these encumbrances would have affected the conditions of Luciano's employment cannot be assessed given her headlong departure.

27. As *Morgan* makes clear, a hostile act of harassment need not be independently actionable to satisfy the limitations period for a hostile environment claim. *Id.* at 115, 122 S.Ct. 2061.

*Constructive Discharge*

 Title VII makes it "an unlawful employment practice for an employer ... to discharge any individual ... because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1). In a wrongful termination case, a plaintiff

> must first establish a prima facie case, that is: (1) that she was within a protected class; (2) that she met the employer's legitimate performance expectations; (3) that she was actually or constructively discharged; and (4) that she was replaced by another employee with similar skills and qualifications. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Alleging constructive discharge presents a "special wrinkle" that amounts to an additional prima facie element. In such cases, the plaintiff must prove that [her] employer imposed "working conditions so intolerable that a reasonable person would feel compelled to forsake [her] job rather than to submit to looming indignities."

*See Landrau–Romero v. Banco Popular De Puerto Rico,* 212 F.3d 607, 612–613 (1st Cir.2000). "Typically, the employer must either (1) take something of consequence from the employee, say, by discharging or demoting her, reducing her salary, or divesting her of significant responsibilities, or (2) withhold from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice of considering her for promotion after a particular period of service." *Blackie,* 75 F.3d at 725–726. A constructive discharge also may occur when an employer effectively prevents an employee from performing her job. *Sanchez v. Puerto Rico Oil Co.,* 37 F.3d 712, 719 (1st Cir.1994). To prove a constructive discharge, a plaintiff must offer evidence of more severe harassment than that required for a hostile work environment

claim. *Hernandez–Torres v. Intercontinental Trading, Inc.,* 158 F.3d 43, 48 (1st Cir.1998). For example, an injury to an employee's pride resulting from the loss of a promotion will not, in and of itself, support a finding of constructive discharge. *See Serrano–Cruz v. DFI Puerto Rico, Inc.,* 109 F.3d 23, 27 (1st Cir.1997). Because the test is objective, the employer's subjective intent is immaterial. *Ramos v. Davis & Geck,* 167 F.3d 727, 732–733 (1st Cir.1999). So too are the employee's hurt feelings, no matter how sincerely held. *Suarez v. Pueblo Int'l, Inc.,* 229 F.3d 49, 54 (1st Cir.2000). Instead, the employee must show that her working conditions were so difficult or unpleasant that "a reasonable person in [her] shoes would have felt compelled to resign." *Marrero v. Goya of Puerto Rico, Inc.,* 304 F.3d 7, 28 (1st Cir.2002), *citing Alicea Rosado v. Garcia Santiago,* 562 F.2d 114, 119 (1st Cir.1977).

 Massachusetts and federal law are in accord in defining a constructive discharge. The test is met

> if, based on an *objective* assessment of the conditions under which the employee has asserted [she] was expected to work, it could be found they were so difficult as to be intolerable.... A single, isolated act of an employer (or an agent of the employer) usually will not be enough to support a constructive discharge claim. Thus, evidence of a single unfavorable performance review or even of a demotion generally will not be deemed sufficient to support a claim.... " 'In order to amount to a constructive discharge, adverse working conditions must be unusually "aggravated" or amount to a "continuous pattern" before the situation will be deemed intolerable.' "

*GTE Products Corp. v. Stewart,* 421 Mass. 22, 34–35, 653 N.E.2d 161 (1995).

While Luciano's resignation from Coca–Cola NE was motivated by her displeasure with Gordon's negative evaluation and by perceived foot-dragging on the part of Smith and Papapietro in responding to her complaints, it is impossible to see how her working conditions could be deemed unbearable. Many of her complaints seem relatively insignificant (her discomfort at participating in supposedly male-oriented games, and her pique at not being invited to a Red Sox outing). While others carry more weight (the transfer of subordinates, Gordon's refusal to meet with her privately to discuss sales strategy, his undermining of her authority, and his recision of her role as a presenter to senior management), Luciano fails to show how any of these incidents, singly or collectively, created such an inability to perform her job that resignation was her only plausible choice. By Luciano's own account, she was performing successfully (and for that reason was especially resentful of Gordon's negative evaluation). "[T]he fact that the plaintiff endured a hostile work environment—without more—will not always support a finding of constructive discharge. To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment. Rather, the jury must find that the working conditions were so unpleasant that 'staying on the job while seeking redress [would have been] intolerable.'" *Marrero*, 304 F.3d at 28. At a minimum, a reasonable person would have expected Luciano to await the results of the 360 review and the response of senior management to its findings before tendering her resignation. Consequently, the constructive discharge claim cannot survive as a matter of law.

*Hostile Environment*

Whether Luciano has set out the elements of such a claim is an open question. A hostile environment claim is typically based on offensive, gender-based conduct that is so severe or pervasive that it alters the terms or conditions of a plaintiff's employment.[28] *Brown v. Hot. Sexy and Safer Productions, Inc.*, 68 F.3d 525, 540 (1st Cir.1995); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66–73, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). "Whether an environment is 'hostile' or 'abusive' can be determined only by looking at all of the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.... [W]hile psychological harm, like any other relevant factor, may be taken into account, no single factor is required." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Gender-based harassment and sexual harassment are not always the same. Sex-based harassment need not be overtly sexual to be actionable. *O'Rourke v. City of Providence*, 235 F.3d 713, 729 (1st Cir.2001) (incidents of humiliating remarks directed at women and work-sabotaging pranks). *See also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

"Hostile environment harassment is readily distinguishable from 'job status' discrimination, another type of employment discrimination that occurs when action is taken that adversely affects an employee's job status, remuneration or

---

**28.** The sexualized form of gender harassment, which consists of promises of favorable treatment or threats of unfavorable treatment intended to coerce an employee into submitting to unwelcome sexual advances (so-called *quid pro quo* harassment), is not at issue. *See Lipsett v. University of Puerto Rico*, 864 F.2d 881, 897 (1st Cir.1988).

benefits and it is based upon the employee's membership in a protected class.... Thus, when both harassment and 'job status' discrimination claims are made, they are analyzed separately." *Lattimore v. Polaroid Corp.*, 99 F.3d 456, 463 (1st Cir. 1996). Courts should, however, avoid disaggregating a hostile environment claim into instances of sexually oriented conduct and instances of unequal treatment and then discounting the latter. *O'Rourke*, 235 F.3d at 730. A claim of "a hostile work environment is a unitary cause of action based on the cumulative effect of hostile acts over the course of time, not one action based on the sum total of many mutually distinct incidents." *Cuddyer*, 434 Mass. at 533, 750 N.E.2d 928. *Cf. Brown*, 68 F.3d at 541 n. 13 (a one-time exposure to offensive comments is not *per se* incapable of sustaining a hostile environment claim).

 In assessing a hostile environment claim, the relevant factors must be viewed objectively and subjectively. If the conduct is not so severe or pervasive that a reasonable person would find it hostile or abusive, no Title VII or c. 151B right is implicated. Similarly, if the plaintiff does not subjectively view the environment to be abusive, the conduct has not actually altered the conditions of her employment. *Harris*, 510 U.S. at 21–22, 114 S.Ct. 367. *See also Ramsdell v. Western Massachusetts Bus Lines, Inc.*, 415 Mass. 673, 677–678 n. 3, 615 N.E.2d 192 (1993) (no cause of action where plaintiff indulged with relish in the same types of offensive conduct); *Muzzy v. Cahillane Motors, Inc.*, 434 Mass. 409, 412, 749 N.E.2d 691 (2001) (endorsing *Oncale's* "reasonable person" standard).

 In summarizing a hostile environment claim from Luciano's perspective, hers is a tale of workplace indignities that ran the gamut from social slights to demeaning treatment intended to destroy her self-confidence and her standing with her co-workers and subordinates. In Luciano's view of the Coca–Cola workplace, men were the favored creatures. After emerging as one of the highest ranking saleswomen at Coca–Cola, she found herself the victim of a retaliatory male culture bent on keeping her in her place. She was passed over for promotions that were given to male counterparts with less sales experience. A presentation that she had prepared for senior Coca–Cola management was taken from her to deflect the positive light to her male rivals. Unlike her male colleagues, she was the subject of public condescension, ridicule, verbal abuse, and unfair criticism of her leadership abilities and management style. She was denied the mentoring that was given to male managers and deprived of the staff that she needed to fulfill the increasing demands that were placed upon her. She also points to the dearth of women at Coca–Cola NE in executive positions. While statistical evidence is often of marginal assistance in employment discrimination cases, *see Hillstrom v. Best Western TLC Hotel*, 354 F.3d 27, 32 (1st Cir.2003), statistics showing that the upper ranks of management are closed to a protected group "may support an inference that a particular decision was tainted by an unlawful bias." *Lipchitz v. Raytheon Co.*, 434 Mass. 493, 509, 751 N.E.2d 360 (2001).[29]

 Ordinarily, this might be enough to send a hostile environment claim to a

---

**29.** This, of course, is the world of Coca–Cola NE as seen from Luciano's vantage. What makes the issue as close as it is, lies in the fact the Coca–Cola has come forward with plausible counter-arguments to many, if not most, of Luciano's complaints. Coca–Cola, for example, while acknowledging that Massey and Gordon may have had personality deficiencies, points to evidence suggesting that they treated male subordinates as roughly as they did the females. *See Williams*, 220 F.3d at 19.

jury. There is, however, a fairness problem implicit in Luciano's MCAD charge and in her Complaint. Both Title VII and c. 151B require the filing of an administrative charge as a prerequisite of filing a civil action. This filing requirement has a dual purpose, first to give the relevant agency an opportunity to investigate and conciliate the claim, and second to give a defendant fair notice of a potential lawsuit. *Davis v. Lucent Technologies, Inc.*, 251 F.3d 227, 231 (1st Cir.2001); *Carter v. Commissioner of Correction*, 43 Mass.App. Ct. 212, 217, 681 N.E.2d 1255 (1997).

> That purpose would be frustrated if the employee were permitted to allege one thing in the administrative charge and later allege something entirely different in a subsequent civil action. Consequently, we have stated that, in employment discrimination cases, "[t]he scope of the civil complaint is ... limited by the charge filed with the EEOC and the investigation which can reasonably be expected to grow out of that charge." *Powers*, 915 F.2d at 38 (quoting *Less v. Nestle Co.*, 705 F.Supp. 110, 112 (W.D.N.Y.1988)); *see also Johnson v. General Electric*, 840 F.2d 132, 139 (1st Cir.1988).

*Lattimore*, 99 F.3d at 464.

Whether this is what Luciano has done can be argued either way. On the one hand, neither the charge nor the Complaint (nor the plaintiff's brief) ever use the term "hostile environment." Not surprisingly, as a result Coca–Cola's otherwise thorough brief never discusses the issue. On the other hand, both the administrative charge and the Complaint recite a litany of factual assertions that more closely resemble allegations of harassment than they do claims of job status discrimination. As *Lattimore* (and *Powers v. Grinnell Corp.*, 915 F.2d 34, 37–38 (1st Cir.1990)), make clear, the focus is not on the "literary exactitude" with which a plaintiff sets

out the facts and theories upon which her claims are based, but on the direction and scope of the investigation that could be expected to flow from the allegations contained in the charge. *Lattimore*, 99 F.3d at 464–465. It might be one thing, as in *Lattimore*, to advance a wholly separate claim based on facts that are temporally and qualitatively unrelated to those specified in the charge; it might be quite another to assert separate legal theories based on a nucleus of alleged discriminatory acts that are common to both claims.

## Tortious Interference

To make out a case of tortious interference, an at-will employee "must prove that: (1) she had an advantageous employment relationship with her employer; (2) the defendant knowingly induced the employer to break that relationship; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the employee was harmed by the defendant's actions." *Weber v. Community Teamwork, Inc.*, 434 Mass. 761, 781, 752 N.E.2d 700 (2001). "[S]omething more than intentional interference is required" to make out the tort. *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 815, 551 N.E.2d 20 (1990) (adopting *Restatement (Second) of Torts*, § 766 (1977)). "The additional ingredient is improper conduct, which may include ulterior motive (e.g., wishing to do injury) or wrongful means (e.g., deceit or economic coercion)." *Schwanbeck v. Federal–Mogul Corp.*, 31 Mass.App.Ct. 390, 412, 578 N.E.2d 789 (1991). *See also King v. Driscoll*, 418 Mass. 576, 587, 638 N.E.2d 488 (1994) (the tort requires "a spiteful, malignant purpose, unrelated to the legitimate corporate interest," motivations of personal gain or dislike of the employee are not enough); *Clement v. Rev–Lyn Contracting Co.*, 40 Mass.App.Ct. 322, 325, 663 N.E.2d 1235 (1996) (where a supervi-

sor is acting within the scope of his responsibilities in terminating an at-will employee he is privileged to do so unless acting with "actual malice"—where a supervisor's motives are mixed the plaintiff has the burden of proving that his actions "were unrelated to any legitimate corporate interest."). "In the employment and discharge context, the law of this jurisdiction seeks to protect a corporate official's freedom of action by requiring proof that the official acted with actual malice." *Alba v. Sampson*, 44 Mass.App.Ct. 311, 314, 690 N.E.2d 1240 (1998). *Compare O'Brien v. New England Telephone & Telegraph Co.*, 422 Mass. 686, 690, 664 N.E.2d 843 (1996) ("Screaming at an employee repeatedly to humiliate her in front of other employees, calling her names, and denying her work to do when work is available could be found both to exceed the protected conduct of a supervisor and to constitute malicious conduct unrelated to an employer's legitimate business interests.").

As to defendants Smith and Papapietro, Luciano has offered nothing (even by way of allegation) that could be construed as reflecting on their part "a spiteful, malignant purpose, unrelated to the legitimate corporate interest." A manager's disagreement with an employee's complaints about her supervisor after he has investigated the facts (which is the most that can be said about Papapietro), cannot possibly amount to malice. In the same vein, the failure of a manager to respond to a complaint with the absolute sense of urgency that an employee feels the situation requires (which is the most that can be said about Smith), cannot be characterized as malicious. As to Gordon,

while it is not explicitly stated, Luciano's Complaint leaves the impression that she interpreted his negative evaluation as the opening salvo in a campaign intended to force her resignation. What is missing, however, is any evidence that Gordon, if indeed that was his motive, was acting out of actual malice as opposed to a perhaps mistaken assessment of his employer's best interest, or even out of personal antipathy. *Cf. Williams*, 220 F.3d at 19 ("That [a supervisor] may have harbored hostility and treated [plaintiff] unfairly standing alone is not probative of gender based animus."). Tellingly, Luciano devotes none of her brief to defending the tortious interference claims against Gordon or the other defendants.[30]

### ORDER

For the foregoing reasons, Counts VI, VII, and VIII of the Complaint (the tortious interference claims against Smith, Papapietro, and Gordon) are *DISMISSED*. Defendants' motion for summary judgment as to Counts IV and V (c. 151B aiding and abetting on the part of Smith and Papapietro) is *ALLOWED*. The motion for summary judgment as to Count III (c. 151B aiding and abetting on the part of Gordon) is *DENIED* without prejudice.[31] Coca-Cola's motion for summary judgment is *ALLOWED* as to the claims of constructive discharge and job status discrimination. The motion for summary judgment is *DENIED* without prejudice as to any viable hostile environment claim under Title VII and c. 151B. The parties will be given leave to further address two issues: (1) can Luciano's MCAD charge be fairly

---

**30.** As Coca–Cola points out, because Luciano cannot show a constructive discharge (because of her voluntary resignation), she could not in any event satisfy the economic harm element of the tort.

**31.** Chapter 151B, unlike Title VII, provides on its face for individual liability. *Beaupre v. Cliff Smith & Assocs.*, 50 Mass.App.Ct. 480, 491, 738 N.E.2d 753 (2000). *Compare Serapion v. Martinez*, 119 F.3d 982, 992 (1st Cir. 1997) *with Tomka v. Seiler Corp.*, 66 F.3d 1295, 1314–1317 (2d Cir.1995).

construed to give notice of a hostile environment claim; and (2) if so, is such a claim legally viable? The opening brief for Coca-Cola and Gordon shall be filed within twenty-one (21) days of this Order. Plaintiff will have fourteen (14) days thereafter to respond.

SO ORDERED.